878 So.2d 1246 (2004)
Luther DOUGLAS, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1666.
Supreme Court of Florida.
May 6, 2004.
Rehearing Denied June 15, 2004.
*1250 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Curtis M. French, Senior Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Luther Douglas, who was twenty-five years old at the time of the crime, was convicted of the December 1999 sexual battery and first-degree murder of eighteen-year-old Mary Ann Hobgood. The jury recommended a sentence of death by a vote of eleven to one. Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial judge followed the jury's recommendation and imposed a sentence of death. This is Douglas's direct appeal of his convictions and death sentence.[1]

FACTS AND PROCEDURAL HISTORY
On the evening of December 25, 1999, Hobgood left her parents' house in Jacksonville, Florida, with her friend, Misty Jones. Douglas, who was Jones's boyfriend at the time and who had not previously met Hobgood, drove Jones to Hobgood's house and drove away with both women in his vehicle. The vehicle Douglas was driving that night was a red Ford Escort, which belonged to Jimela Dozier, the mother of one of Douglas's children. Jones later described the condition of the vehicle that night as dirty with trash inside and pollen and dirt on the exterior. After leaving Hobgood's, the three first stopped at a liquor store and bought a bottle of rum and soda, which Douglas and Hobgood drank. They then went to several bars in the Jacksonville area. Around midnight, Jones indicated that she was not feeling well and Douglas drove her home. Douglas then left Jones's house in the Escort with Hobgood.
Approximately two hours later, Douglas arrived at the apartment where he was living and asked a teenage occupant to go with him to "take care of some business." When Douglas's request was refused he left the apartment.
Jones testified that Douglas called her in the early morning hours of December 26, first telling her that he had dropped Hobgood off at a bar and then stating that he had taken Hobgood home. When Jones saw Douglas that morning she noticed scratch marks on his neck that had not been there the previous evening. In Douglas's presence, Jones called Hobgood's home, and after speaking with Hobgood's mother, learned that Hobgood had not returned home. When Hobgood's sister called Jones sometime later that day, Jones told her that they had been out the night before with Timothy Hightower, Jones's ex-boyfriend. Jones testified that *1251 she lied to Hobgood's sister because Douglas was with her and she figured that something was wrong.
Jones then confronted Douglas regarding Hobgood's whereabouts. The two went for a drive in the red Escort, which Jones noticed was newly clean inside and out. During the drive, Douglas admitted to Jones that he had beaten Hobgood and thrown her out of the car, leaving her for dead. Jones recalled that when she asked Douglas if he beat Hobgood because "she didn't have sex with black boys,"[2] Douglas just smiled. Douglas also told Jones that if she was questioned she should point the blame toward Hightower or she would end up like Hobgood. When police officers questioned Jones later that night she told them the same story she relayed to Hobgood's sister  that she and Hobgood had gone out with Hightower. Jones also gave a sworn statement to that effect. Jones subsequently recanted those statements when the officers questioned her again in January 2000 and told her that they knew she had lied.[3]
On the afternoon of December 26, 1999, Hobgood's body was found along a set of railroad tracks. She was positioned on her back in a shrub line with her legs stretched out in front of her. Hobgood's body was nude from the waist down, except for her black socks. Her knit top and black bra were torn and pushed up to her shoulders, exposing her breasts. A few feet from Hobgood's body, the police found a tire lug wrench, a rubber car part and a blood soaked maroon jacket. The maroon jacket was later identified by Jones as the one worn by Douglas on December 25. A Jacksonville Sheriff's Office detective testified that the rubber car part looked identical to a part recovered from the red Ford Escort.
Associate medical examiner Dr. Matthew Areford, who went to the scene on December 26 and performed the autopsy on Hobgood on December 27, noted that Hobgood had suffered extensive injury, particularly to her head. Dr. Areford concluded that she died of blunt head trauma. Dr. Areford testified that while Hobgood was alive she received at least ten separate blows to her face, seven blows to the back of her head and seven to ten blows to her hands and arms. Her jaw and nose were broken, several of her teeth had been knocked out and her right shoulder was dislocated. Dr. Areford indicated that these injuries could have been inflicted by another person's fist or by a hard object such as the lug wrench found at the scene. Several of the wounds on Hobgood's arms and hands were consistent with defensive wounds.
Although Dr. Areford could not determine the sequence of the injuries inflicted on Hobgood while she was alive, he opined that it was unlikely that Hobgood was struck from behind, fell to the ground and was hit a number of times while unconscious. Dr. Areford explained that such a scenario was inconsistent with the defensive type injuries found on Hobgood's hands and forearm as well as with the fact that there were injuries to all sides of her head, which indicated that she was rolling from side to side.
The autopsy also disclosed extensive injuries to Hobgood's body, in addition to those described above, which were inflicted *1252 after her death. Dr. Areford testified that these injuries were consistent with her body having been run over by the undercarriage of a car.
During the autopsy, Dr. Areford collected a rape kit, which included a set of vaginal swabs. Further analysis of the rape kit was conducted by David George, a serology analyst employed by the Florida Department of Law Enforcement (FDLE). George testified that the vaginal swabs tested positive for the presence of semen.
Subsequent DNA testing matched the semen collected from Hobgood to Douglas. Thomas Petree, an FDLE crime analyst with expertise in serology and DNA, testified that the odds of finding a random match between the sperm taken from the first vaginal swab and Douglas's known DNA profile are approximately one in 660 trillion African-Americans. The odds of finding a random match between the sperm taken from the second vaginal swab and Douglas's known DNA profile are approximately one in 170 quadrillion African-Americans.[4]
On December 27, 1999, Douglas called Jimela Dozier, who had returned to Jacksonville the night before. During the conversation, Douglas asked Dozier to retrieve some items from the trunk of the Escort. When Dozier opened the trunk she found a watch and two rings in the pocket of a black leather jacket. Douglas explained that the leather jacket and the jewelry were Christmas presents for her. The black leather jacket and jewelry were identified at trial as belonging to Hobgood.
The Ford Escort was taken to the FDLE laboratory in Jacksonville. Douglas's fingerprints were found on the inside and outside of the car and Jones's prints were found on the passenger side of the car. Human blood was identified at several locations inside and on the undercarriage of the Escort. DNA analysis of the blood samples taken from the Escort revealed a match with Hobgood's blood. The blood found on the black leather jacket Douglas gave to Dozier and the blood found on the maroon jacket recovered at the crime scene also matched Hobgood's blood. Petree testified that the odds of finding a random match between the DNA in the blood samples and Hobgood's known DNA are approximately one in 3.3 quadrillion Caucasians. Lastly, the lug wrench recovered near Hobgood's body tested positive for human blood but the DNA analysis yielded no results.
On January 24, 2000, lead detective Robert Hinson interviewed Douglas at the police station. Detective Hinson testified that Douglas admitted driving Dozier's red Ford Escort during the Christmas holiday and giving Dozier the black leather jacket and jewelry. Douglas claimed that on Christmas night he had been out with only Jones. After being shown a recent color photograph of Hobgood, Douglas claimed that he did not know Hobgood and had never seen her before. When asked about the presence of blood in the Escort, Douglas stated that the blood belonged to a friend named Eric Ransom, who had gotten into an altercation at a night club and was driven to the hospital by Douglas. *1253 However, jail records showed that Ransom was incarcerated in the Duval County Jail from March 25, 1999, to January 16, 2000. The police placed Douglas under arrest and questioned him a second time. Douglas then admitted that Jones had a female friend with her that night but stated he could not remember whether he had taken Jones's friend home.
While in jail awaiting trial, Douglas talked to fellow inmate Thomas Brown about Hobgood's murder. During their first conversation about the murder, Douglas told Brown that he was charged with the murder of a girl and that he had run over her with a car because she would not move. However, in a later conversation Douglas stated that he ran over the girl because he had beaten her to death but wanted to make it look like a vehicular homicide. Douglas also told Brown that the State had a lot of evidence against him because he "took the pussy." Brown testified that he understood Douglas's statement "took the pussy" to mean that Douglas raped the girl.
Douglas did not present any witnesses during the guilt phase. The jury found Douglas guilty, by special verdict, of first-degree felony murder with sexual battery as the underlying felony. The jury did not find that the killing was premeditated.[5] The jury also found Douglas guilty of a separate count of sexual battery.
During the penalty phase, Douglas presented the testimony of his friends and family members to establish mitigation.[6] Collectively they testified that Douglas comes from a religious, close-knit family, that Douglas's father, who was strict and controlling, sexually molested Douglas's older sister and was forced to leave when Douglas was nine or ten years old, that Douglas loves and cares for his own four children, that Douglas is a good brother and son, that Douglas is a positive, upbeat and friendly person, that Douglas is a smart person, although he dropped out of high school due to reading problems, and that Douglas worked at various jobs. However, several of these witnesses also testified that they had not had much contact with Douglas as an adult, and most of the witnesses who testified about Douglas's love and support of his children did not know how many children Douglas had.
The jury recommended the death penalty by a vote of eleven to one. The trial court held a Spencer[7] hearing to allow both the State and Douglas to present additional evidence and arguments concerning sentencing. The trial court found two aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel (HAC); and (2) that the murder was committed in the course of a sexual battery. The trial court found one statutory mitigator  that Douglas had no significant history of prior criminal activity in that he did not have a prior felony conviction  but assigned this mitigating circumstance little weight due to evidence that Douglas engaged in illegal drug activity that did not lead to arrests or convictions.
*1254 The trial court also considered thirty nonstatutory mitigators proposed by Douglas and found that the following sixteen were proven: (1) Douglas has a close-knit, religious family (little weight); (2) Douglas's family supports him even after his conviction (little weight); (3) Douglas was abused by his father both psychologically and physically (little weight); (4) Douglas witnessed his father commit acts of domestic violence against his mother (little weight); (5) Douglas and his siblings were afraid of their father when they were children (little weight); (6) Douglas's father was arrested for child abuse after beating Douglas with a belt (little weight); (7) Douglas's father sexually abused Douglas's oldest sister for seven years and was eventually arrested for the crime (little weight); (8) the revelation of the sexual abuse of Douglas's oldest sister had a devastating impact on Douglas and the rest of his family (little weight); (9) Douglas has an interest in the scriptures (little weight); (10) Douglas was helpful to his father around the house (little weight); (11) Douglas was diagnosed with learning disabilities in the second grade (very little weight); (12) Douglas never finished high school (very little weight); (13) Douglas has made plans for self-improvement since his incarceration, including obtaining his GED (little weight); (14) Douglas can be rehabilitated (moderate weight); (15) Douglas can be a productive inmate in prison (moderate weight); and (16) Douglas exhibited appropriate behavior during the trial (little weight). The trial court rejected Douglas's other fourteen proposed mitigating circumstances as either not proven or not mitigating in nature.[8] Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court agreed with the jury's recommendation and imposed the death penalty.[9]

ISSUES ON APPEAL
On appeal, Douglas raises five issues: (1) the trial court erred in allowing the introduction of enlarged crime scene and autopsy photographs; (2) the trial court erred in rejecting several proposed mitigating circumstances and in assigning little weight to the mitigating circumstances related to Douglas's abusive childhood; (3) the trial court erred in instructing the jury on and in finding HAC; (4) Douglas's death sentence is not proportionate; and (5) Florida's capital sentencing procedure is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We address each of these issues below. In addition, although not raised by Douglas, we have reviewed the record and conclude, based on Douglas's *1255 statements to Jones and Brown, as well as the physical evidence, that there is sufficient evidence to support Douglas's conviction for first-degree felony murder.

I. Photographs
In Douglas's first issue on appeal he asserts that the trial court erred in allowing the State to introduce into evidence one 14-by 17-inch color photograph depicting Hobgood's body as it was found at the crime scene and thirteen 8-by 10-inch autopsy photographs depicting different areas of Hobgood's body. Douglas argues that these photographs had little, if any, relevancy and that their probative value was outweighed by their prejudicial effect.
This Court reviews the admission of photographic evidence for an abuse of discretion. See Philmore v. State, 820 So.2d 919, 931 (Fla.), cert. denied, 537 U.S. 895, 123 S.Ct. 179, 154 L.Ed.2d 162 (2002). "The test for admissibility of photographic evidence is relevancy rather than necessity." Pope v. State, 679 So.2d 710, 713 (Fla.1996). Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived. See Looney v. State, 803 So.2d 656, 669-70 (Fla.2001). This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner's testimony, the manner of death, or the location of the wounds. See, e.g., Philmore, 820 So.2d at 932 (autopsy photograph was relevant to show the nature and extent of the bullet wound, and for demonstrating premeditation); Floyd v. State, 808 So.2d 175, 184 (Fla.2002) (autopsy photographs "were relevant to show the circumstances of the crime and the nature and extent of the victim's injuries"); Brooks v. State, 787 So.2d 765, 781 (Fla.2001) (five autopsy photographs were relevant to the medical examiner's determination as to the manner of the victim's death); Pope, 679 So.2d at 713-14 (autopsy photographs were relevant to illustrate the medical examiner's testimony and the injuries he noted); Wilson v. State, 436 So.2d 908, 910 (Fla.1983) (nine autopsy photographs were admissible because they were relevant to show identity, the nature and extent of the victims' injuries, the manner of death, the nature and force of the violence used, and premeditation).
However, even where photographs are relevant, the trial court must still determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence." Czubak v. State, 570 So.2d 925, 928 (Fla.1990) (quoting Leach v. State, 132 So.2d 329, 331-32 (Fla.1961)) (second alteration in original). In making this determination, the trial court should "scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point." Marshall v. State, 604 So.2d 799, 804 (Fla.1992). As we explained in Almeida v. State, 748 So.2d 922, 929 (Fla.1999), the relevancy standard "by no means constitutes a carte blanche for the admission of gruesome photos." After reviewing the photographs and pertinent testimony, we conclude that the trial court did not abuse its discretion in admitting the photographs because they were relevant and not so inflammatory as to create undue prejudice in the minds of the jurors.
The single photograph of Hobgood as she was found at the crime scene was relevant to show how Hobgood's body appeared at the time the police and Dr. *1256 Areford arrived on the scene. In fact, Dr. Areford referred to this photograph when explaining his initial impressions and assessment of the injuries sustained by Hobgood. Because the crime scene photograph at issue in this case accurately depicts how Hobgood was found at the crime scene and "is not so shocking as to outweigh its probative value," Pope, 679 So.2d at 714, we conclude that the trial court did not abuse its discretion in admitting the photograph into evidence.
With respect to the autopsy photographs, each was relevant to show the location of Hobgood's wounds as well as to aid Dr. Areford in explaining the nature of Hobgood's injuries to the jury. In addition, and contrary to Douglas's argument, the autopsy photographs depicting the postmortem injuries were relevant because these injuries were inflicted by the car driven by Douglas on the night of the murder. Thus, this case is unlike Czubak, in which we concluded that the trial court erred in admitting gruesome photographs that depicted the victim at least a week after she had died and had suffered additional postmortem injuries from events that occurred neither during nor directly after the murder. See 570 So.2d at 928-29. This case is also distinguishable from Hertz v. State, 803 So.2d 629 (Fla.2001), in which we concluded that the trial court erred in admitting autopsy photographs that depicted the effect of a fire that occurred after the victims' deaths and were not probative as to the medical examiner's determination of the manner of the victims' deaths. See 803 So.2d at 642-43. In this case, Dr. Areford testified that Hobgood's postmortem injuries were consistent with having been run over by the undercarriage of a car. This testimony was relevant to identify Douglas as the assailant by explaining how Hobgood's blood ended up on the undercarriage of the red Ford Escort that Douglas was driving on the night of the murder.
We also note that the trial court reviewed the photographs before allowing them to be admitted into evidence, see Philmore, 820 So.2d at 932 (considering the trial court's preliminary screening as a factor weighing in favor of admissibility), and that the State selected only one photograph of each area of Hobgood's body to aid Dr. Areford in explaining the location of the wounds and the manner of Hobgood's death. In fact, Dr. Areford testified that each photograph depicted different injuries to Hobgood. Dr. Areford also explained to the jury that because of the extensive trauma to Hobgood's head he would be unable to identify each injury and that the jury could get a better impression looking at the photographs than he could ever give with his words. These statements contradict Douglas's argument to the trial court that Dr. Areford's verbal description of Hobgood's injuries to the jury, without the photographs, would be sufficient. The trial court did not abuse its discretion in admitting the thirteen autopsy photographs.

II. Mitigation
In his next issue on appeal, Douglas argues that the trial court erred in finding that he failed to establish in mitigation that he loves his children, is a good father to his children, supports his children, is an upbeat, positive person, has an outgoing friendly personality, is always respectful to his elders, and has been a good brother and son. Douglas also contends that the trial court erred in finding his proposed mitigators that he worked a variety of jobs, that he was impaired by alcohol at the time of the crime, and that his father was removed from the home were not mitigating in nature. Lastly, Douglas argues that the trial court erred in assigning *1257 little weight to the mitigating circumstances related to his abusive childhood.
In Campbell v. State, 571 So.2d 415 (Fla.1990), receded from in part by Trease v. State, 768 So.2d 1050, 1055 (Fla.2000), this Court set forth guidelines for trial courts to follow in evaluating proposed mitigation:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence....
Id. at 419 (emphasis supplied) (citations and footnotes omitted). However, the trial court may find that an established mitigating factor is entitled to no weight for reasons or circumstances unique to the case. See Trease, 768 So.2d at 1055. In Blanco v. State, 706 So.2d 7 (Fla.1997), we summarized our standards of review of the trial court's findings as follows:
1) Whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; 2) whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard; and finally, 3) the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard.
Id. at 10 (footnotes omitted). With these principles in mind, we address each of Douglas's arguments in turn.

A. Proposed mitigation rejected as unproven
Douglas first asserts that the trial court erred in finding that Douglas failed to establish several of his proposed mitigators: specifically, that he loves his children, is a good father to his children, supports his children, is an upbeat, positive person, has an outgoing and friendly personality, is always respectful to his elders, and has been a good brother and son. We conclude that there is competent, substantial evidence to support the trial court's rejection of these mitigators as unproven. See Blanco, 706 So.2d at 10.
Although there is testimony from a number of witnesses that Douglas exhibits all of these qualities, this testimony is not substantiated either by Douglas's actions or by the testimony of those who have firsthand knowledge of the respective quality. For example, several witnesses testified that Douglas loves his children, is a good father, and supports his children. However, on cross-examination many of these witnesses could not verify how many children Douglas had. Nor did any of the witnesses know whether Douglas paid child support on a regular basis. In addition, none of the four mothers of Douglas's four children testified that Douglas was a good father, spent quality time with his children or provided any financial or emotional support. In rejecting these proposed mitigators as unproven, the trial court stated in part:
The Defendant, at the age of twenty-five (25) had four (4) children with four (4) different women. Although the Defendant occasionally visited with some of his children, there is no evidence that he did anything worthwhile or beneficial for any of his children on a regular basis.
We conclude that there is no error in the trial court's finding that the proposed mitigators regarding Douglas's role as a father *1258 were not supported by the greater weight of the evidence.
Several witnesses who are Douglas's elders also testified that Douglas had always been respectful to them. However, as noted by the trial court, this does not establish Douglas's proposed mitigating circumstance that he is and always has been respectful of his elders. Thus, we conclude that the trial court did not err in rejecting this mitigator as unproven.
Next, despite several family members' testimony that Douglas has been a good son and brother, the trial court found this proposed mitigation unproven, reasoning:
The Defendant's mother testified that the Defendant at one time chose to sell drugs rather than work in order to buy shoes and that he got into the streets and drugs and partying with girls. In addition, he did not maintain steady employment. This behavior does not support the conclusion that the Defendant was concerned with his mother's [and siblings'] welfare.
This evidence of Douglas's conduct, which contradicts the testimony that he has been a good son and sibling, provides competent, substantial evidence to support the trial court's rejection of this mitigating circumstance. See Taylor v. State, 855 So.2d 1, 30 (Fla.2003) ("Although Taylor introduced testimony of family and friends that he was a nonviolent person, the trial judge was free to weigh the testimony of the individuals [against Taylor's previous armed robbery conviction] and still reject the mitigating circumstance."), cert. denied, ___ U.S. ___, 124 S.Ct. 1605, 158 L.Ed.2d 248 (2004). However, even if we were to conclude that the trial court erred in rejecting this mitigation, this error would be harmless given the other mitigating evidence considered and weighed by the trial court and the minimal amount of additional mitigation these factors would have provided. See id. (concluding that any error in the trial court's rejection of mitigation that tended to show that the defendant had some redeeming qualities was harmless given the minimal amount of mitigation the factor would have provided).
The last mitigating circumstances the trial court rejected as unproven are that Douglas is a positive, upbeat person and has an outgoing, friendly personality. The trial court found that these "character traits are entirely inconsistent with the Defendant's behavior that was displayed on December 25, 1999, and December 26, 1999." Douglas argues that the fact that he committed a homicide does not negate the positive character traits established by the evidence. We agree. However, as with the trial court's rejection of Douglas's proposed mitigation that he is a good son and brother, we conclude that any error in the trial court's rejection of these mitigating circumstances is harmless beyond a reasonable doubt.

B. Proposed mitigation rejected as not mitigating in nature
Douglas next challenges the trial court's finding that the following proposed nonstatutory factors were not mitigating in nature: (1) that Douglas's father was removed from the home when Douglas was nine; (2) that Douglas has worked at several different jobs; and (3) that Douglas was impaired by alcohol at the time of the crime. A mitigating circumstance is "`any aspect of a defendant's character or record and any of the circumstances of the offense' that reasonably may serve as a basis for imposing a sentence less than death." Campbell, 571 So.2d at 419 n. 4 (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). As previously noted, whether a particular circumstance is truly mitigating in nature is a *1259 question of law and subject to de novo review. See Blanco, 706 So.2d at 10.
Douglas first challenges the trial court's rejection of his proposed mitigator that his father was removed from the home. The trial court found this circumstance not mitigating because Douglas's father's departure was beneficial to the family, including Douglas. Although evidence was presented that the removal of Douglas's father from the home was emotionally difficult for Douglas, it was also beneficial given the evidence presented that his father was both psychologically and physically abusive. Therefore, we conclude that the trial court correctly found that this factor was not mitigating in nature.
Douglas next argues that the trial court erred in rejecting his proposed mitigator that he worked at several different jobs because this mitigator demonstrates that Douglas can be productive in prison and is capable of contributing to society. Several witnesses testified that Douglas was a good worker. However, no evidence was presented that he ever maintained steady employment. Thus, the trial court did not err in finding that this proposed mitigation was not mitigating in nature. More importantly, the trial court did find that the mitigating circumstance that Douglas can be a productive inmate in prison was proven and gave this mitigator moderate weight.
Douglas also asserts that the trial court erred in rejecting the proposed mitigator that he was impaired by alcohol. In the sentencing order, the trial court explained its reasons for rejecting this proposed mitigator:
The evidence established that the Defendant had been drinking alcohol at the time he killed Ms. Hobgood. The extent of his impairment was not established. He was able to drive an automobile with a manual shift transmission throughout the evening of the murder and he was able to converse with the teenage resident where he was living and [with] Misty Jones during the early morning hours. No evidence of chronic or long term drug and alcohol abuse was presented in mitigation. The Court notes that the legislature has eliminated voluntary intoxication as a defense to any crime. The Court does not find voluntary impairment by alcohol to be a mitigating circumstance.
(Emphasis supplied.)
Initially, we conclude that the trial court erred in relying on the Legislature's elimination of the voluntary intoxication defense to conclude that Douglas's alcohol consumption was not mitigating in nature. Regardless of the fact that the Legislature has concluded that voluntary intoxication resulting from alcohol consumption can no longer be presented as a defense to a crime,[10] under the particular facts of the case, intoxication remains a circumstance "that reasonably may serve as a basis for imposing a sentence less than death." Campbell, 571 So.2d at 419 n. 4; see also *1260 Johnson v. State, 608 So.2d 4, 13 (Fla.1992) ("While voluntary intoxication or drug use might be a mitigator, whether it actually is depends upon the particular facts of a case.").
Nevertheless, we conclude that the trial court did not err in rejecting this proposed mitigator because no evidence was presented that Douglas was actually impaired by alcohol at the time of the crime. Thus, Douglas's consumption of alcohol on the night of the murder is not mitigating in this case. Cf. Johnson, 608 So.2d at 13 ("There was too much purposeful conduct for the court to have given any significant weight to Johnson's alleged drug intoxication, a self-imposed disability that the facts show not to have been a mitigator in this case.").

C. Mitigation related to Douglas's abusive childhood assigned little weight
Lastly, Douglas asserts that the trial court erred in assigning little weight to the mitigating circumstances related to Douglas's abusive childhood because the abuse was remote in time.[11] Abuse suffered by a defendant as a child is "mitigating in nature." Walker v. State, 707 So.2d 300, 318 (Fla.1997); see also Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). However, the weight given to this mitigating circumstance is within the trial court's discretion. See Morton v. State, 789 So.2d 324, 332 (Fla.2001); see also Blanco, 706 So.2d at 10 (stating that the weight given to a mitigating circumstance is within the trial court's discretion) (citing Campbell, 571 So.2d at 420).
In Morton, we concluded that the trial court did not abuse its discretion in assigning little weight to the defendant's abusive childhood where the trial court found: (1) "the abuse stopped when [the defendant] was eight years old when his mother divorced her abusive husband and remarried, thereby providing a substitute stable father figure"; (2) "there had been no showing that these experiences diminished [the defendant's] ability to know right from wrong or ... know the seriousness and grave consequences of his acts"; and (3) the defendant's sister, who had also been abused, including sexually abused by the same alcoholic father, proceeded to live a normal and productive life. 789 So.2d at 332 (internal quotation marks omitted). The evidence presented in this case is similar to Morton.
Douglas's father left home when Douglas was nine or ten years old and Douglas's mother subsequently had long-term relationships with two men, one of whom is now Douglas's stepfather, who were kind to Douglas and were not at all abusive towards him. In addition, many witnesses testified that Douglas had a close-knit, supportive family, a circumstance the trial court also considered in mitigation. Accordingly, we conclude that the trial court did not abuse its discretion in giving little weight to the mitigating factors relating to Douglas's abusive childhood.

III. HAC
Douglas next argues that the trial court erred in instructing the jury on and in finding the HAC aggravator. In reviewing an aggravating factor challenged *1261 on appeal, this Court's task "is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d 693, 695 (Fla.1997). We conclude that the trial court did not err in giving the HAC jury instruction and in finding that this aggravating circumstance exists in this case.
The HAC aggravator applies "only in torturous murders  those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Rose v. State, 787 So.2d 786, 801 (Fla.2001) (quoting Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998)). This Court has "consistently upheld HAC in beating deaths." Lawrence v. State, 698 So.2d 1219, 1222 (Fla.1997); see also Dennis v. State, 817 So.2d 741, 766 (Fla.2002) (trial court's finding of HAC was supported by evidence that the victims suffered skull fractures as the result of a brutal beating and that the victims were conscious for at least part of the attack); Bogle v. State, 655 So.2d 1103, 1109 (Fla.1995) (trial court's finding of HAC was supported by evidence that the victim was struck seven times in the head and the medical examiner testified that the victim was alive at the time of the infliction of most of the wounds); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986) (trial court's finding of HAC was supported by evidence that victim was brutally beaten while attempting to fend off blows to the head before he was fatally shot). However, we have also indicated that to support this aggravating circumstance the evidence must show that the victim was conscious and aware of impending death. See Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998) (trial court erred in finding HAC where the medical testimony established that the victim may have been rendered unconscious upon receiving the first blow from the crowbar and, as a result, was unaware of her impending death); Elam v. State, 636 So.2d 1312, 1314 (Fla.1994) (trial court erred in finding HAC where the medical examiner testified that the attack took place in a very short period of time, the defendant was unconscious at the end of this period, and there was no prolonged suffering or anticipation of death).
In this case, the trial court made the following findings with regard to the HAC aggravator:
The evidence heard by the Court at trial ... established beyond a reasonable doubt that the murder of Mary Ann Hobgood by Luther Douglas was a conscienceless or pitiless crime and unnecessarily torturous. Ms. Hobgood was alone with a twenty-five (25) year-old man who had been drinking heavily and who had turned violent. She had no means of escape and she had no ability to protect herself from the violence of Luther Douglas. Death did not come quickly to Ms. Hobgood. The only inference to be drawn from the evidence is that Luther Douglas struck Ms. Hobgood between 24 to 27 times with force sufficient to shatter her skull and jaw and clavicles because she had not loss [sic] consciousness or died until he struck her that many times.
Luther Douglas very clearly intended to kill Ms. Hobgood by beating her to death, although his motive for doing so is not known. Ms. Hobgood knew Luther Douglas was going to kill her after he had raped her and she had sufficient time to contemplate her impending death. One can only imagine the fear, horror, and unbearable pain experienced by Mary Ann Hobgood during the final *1262 moments of her young life as Luther Douglas, an able-bodied young adult male, beat the life out of her defenseless body.
As an initial matter, we conclude that the trial court's finding that Hobgood "knew Luther Douglas was going to kill her after he had raped her" is not supported by the record. There is no evidence that indicates that Hobgood knew Douglas was going to kill her after he raped her. Despite this error, we affirm the trial court's finding of HAC because it is supported by competent, substantial evidence.
Douglas argues that the evidence leaves open the reasonable possibility that Hobgood lost consciousness after the initial blow. Douglas relies on Dr. Areford's testimony during cross-examination that he could not sequence the injuries Hobgood suffered while alive and that if the first injury inflicted was one of the more severe she could have been rendered unconscious. However, Dr. Areford also stated that based on the nature of Hobgood's injuries it was not likely that Hobgood was knocked unconsciousness by the first blow. Specifically, Dr. Areford pointed to the fact that Hobgood had wounds to all sides of her head, which in his opinion indicated that Hobgood was turning her head or trying to roll away during the beating, and that Hobgood had defensive wounds on her hands and forearms. These circumstances are similar to those presented in Dennis, Bogle, and Wilson, in which this Court upheld the trial court's finding of HAC based on evidence that the victims were brutally beaten and remained conscious for at least part of the attack. Accordingly, we find no error in the trial court's finding of the HAC aggravator in this case.

IV. Proportionality
Douglas also contends that his death sentence in this case is not proportionate. The Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In deciding whether death is a proportionate penalty, the Court considers the totality of the circumstances of the case and compares the case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). However, proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)).
In this case, the trial court found two aggravating circumstances, HAC and that the murder was committed in the course of a sexual battery. The trial court found one statutory mitigator, that Douglas has no prior criminal history, which was given little weight due to evidence that Douglas had engaged in illegal drug activity that did not result in arrests. The trial court also found several nonstatutory mitigators, most which were given little or very little weight.
We have recognized that HAC is one of the most serious aggravators in the statutory sentencing scheme, see Morton, 789 So.2d at 331; Larkins v. State, 739 So.2d 90, 95 (Fla.1999), and have upheld death sentences based on circumstances similar to those presented in this case. In Mansfield v. State, 758 So.2d 636, 642, 647 (Fla.2000), we concluded that the death penalty was proportionate where the victim was sexually assaulted and strangled, and the trial court weighed two aggravating factors (HAC and the crime was committed during the commission of a sexual battery) *1263 and five nonstatutory mitigators, including that the defendant had a poor upbringing and dysfunctional family, and suffered from a brain injury due to head trauma and alcoholism. Similarly, in Orme v. State, 677 So.2d 258, 263 (Fla.1996), we rejected a proportionality challenge where the victim was sexually assaulted, beaten, and strangled. The trial court imposed the death sentence in Orme after weighing three aggravating circumstances  HAC, pecuniary gain, and that the crime was committed during the commission of a sexual battery  against two statutory mitigators  substantial impairment and extreme emotional disturbance.
Moreover, the cases cited by Douglas to support his argument that his death sentence is not proportionate are distinguishable. In Larkins, 739 So.2d at 92-93, Sager v. State, 699 So.2d 619, 621 n. 2 (Fla.1997), Voorhees v. State, 699 So.2d 602, 606 n. 2 (Fla.1997), Kramer v. State, 619 So.2d 274, 276 (Fla.1993), and Nibert, 574 So.2d at 1061-62, evidence was presented that the defendants suffered from a mental or emotional disturbance at the time of the murder. In this case, although there was testimony that Douglas had trouble reading and was diagnosed with learning disabilities in the second grade, there was no evidence as to how or whether these learning disabilities affected him at or about the time of the murder. Further, no evidence was presented that Douglas suffered from any mental or emotional disturbance.
Douglas also cites to Johnson v. State, 720 So.2d 232 (Fla.1998), to support his position on proportionality. However, the trial court in Johnson did not find HAC as an aggravator, and this Court concluded that "[t]he prior violent felony aggravating circumstance, although properly found to be present, is not strong when the facts are considered." Id. at 238. Balancing the prior violent felony aggravator and the burglary/pecuniary gain aggravator against seven mitigators, we vacated Johnson's death sentence. See id. We find Johnson distinguishable and in light of the totality of the circumstances of this case as compared to the facts of other capital cases, we conclude that the death penalty is proportionate in this case.[12]

V. Ring v. Arizona
In his last issue on appeal, Douglas argues that Florida's death penalty statute, section 921.141, Florida Statutes (1999), is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We have previously addressed this contention on direct appeal and have concluded that there is no basis for declaring Florida's statute facially unconstitutional. See, e.g., Lawrence v. State, 846 So.2d 440, 451 (Fla.), cert. denied, ___ U.S. ___, 124 S.Ct. 394, 157 L.Ed.2d 286 (2003); Butler v. State, 842 So.2d 817, 834 (Fla.2003).
*1264 Further, section 921.141 is constitutional as applied in this case because one of the aggravating circumstances found by the trial court is that the murder was committed in the course of a sexual battery. The jury unanimously found Douglas guilty of the crime of sexual battery and expressly found, in a special verdict, that Douglas committed the murder during the commission or attempted commission of a sexual battery. Thus, Douglas is not entitled to relief under Ring, which exempts aggravators relying on other convictions from the requirement of jury findings on any fact necessary to impose a sentence of death. See Caballero v. State, 851 So.2d 655, 663-64 (Fla.2003) (rejecting a Ring claim on direct appeal where one of the aggravating circumstances the judge considered was that the defendant committed the murder during the commission of a burglary and kidnapping); Doorbal v. State, 837 So.2d 940, 963 (Fla.) (stating that prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003).

CONCLUSION
For the reasons expressed above, we affirm Douglas's convictions and sentence of death.
It is so ordered.
LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., concurs specially with an opinion, in which CANTERO and BELL, JJ., concur.
PARIENTE, J., concurs as to conviction and concurs in result only as to sentence with an opinion.
ANSTEAD, C.J., concurs as to the conviction and concurs in result only as to the sentence.
WELLS, J., specially concurring.
I concur in the conviction and sentence. I write only to respond to Justice Pariente's opinion, in which she writes directly contrary to the established precedent of this Court in Blanco v. State, 706 So.2d 7, 11 (Fla.1997).
Blanco recognizes the deference which this Court should give to the legislative judgment of what are to be aggravators under the Florida capital punishment statute. As I noted in my concurring opinion in Blanco, this very point was made by the Eleventh Circuit in Bertolotti v. Dugger, 883 F.2d 1503 (11th Cir.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990), in which the court said:
To the extent that Bertolotti challenges the use of felony murder as an aggravating circumstance, he attacks a decision firmly within the discretion of the Florida legislature.
Id. at 1528, n. 22. Moreover, as stated in Bertolotti, the United States Supreme Court rejected a nearly identical claim in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
CANTERO and BELL, JJ., concur.
PARIENTE, J., concurring as to conviction and concurring in result only as to sentence.
I concur in the affirmance both of Douglas's first-degree murder conviction and the sentence of death. I agree that Douglas is not entitled to relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), but disagree with the majority's reasoning on this issue because *1265 I conclude that the murder in the course of a felony aggravator contained in section 921.141(5)(d), Florida Statutes (2003), was unconstitutionally applied to Douglas in violation of both the Fifth and Eighth Amendments to the United States Constitution.
A defendant convicted of first-degree murder cannot qualify for a death sentence unless at least one statutory aggravating factor is found to exist. As I explained in my concurring in result only opinion in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), this additional finding of one or more death-qualifying aggravating circumstances is "mandated not only by the plain language of the capital sentencing statute, but also by the Eighth Amendment to the United States Constitution as interpreted in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny." Id. at 721. Indeed, in Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the United States Supreme Court held that to satisfy the constitutional standard derived from Furman, an aggravating circumstance "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Id. at 877, 103 S.Ct. 2733.
I recognize that in Blanco v. State, 706 So.2d 7, 11 (Fla.1997), the Court held that because the murder in the course of a felony aggravator includes fewer enumerated felonies than the crime of first-degree felony murder, the statutory aggravator is not unconstitutional on its face for failing to narrow the class of death-eligible defendants. As noted in Justice Anstead's specially concurring opinion, in Blanco the evidence was sufficient to establish premeditated murder as well as felony murder, precluding a successful challenge to the statutory aggravator "as applied." See 706 So.2d at 12 n. 20 (Anstead, J., specially concurring). In this case, however, Douglas was convicted of felony murder in which the predicate felony is the same sexual battery supporting the murder in the course of a felony aggravator. Under these circumstances, as stated by Justice Anstead in Blanco,
[b]y making a defendant convicted of felony murder automatically eligible for the death penalty based upon the same felony that was used to establish the defendant's conviction for murder, this scheme simply does not narrow the class of convicted persons who become eligible for the death penalty. Rather, if anything, it clearly enlarges the eligible class in an irrational way.
Id. at 14 (first emphasis supplied). As Justice Anstead explained,
[t]he concept of narrowing requires that once it has been established that a defendant is guilty of first-degree murder the sentencer may properly consider only additional factors, termed aggravators, that genuinely narrow the class of convicted murderers who may be eligible for the death penalty. For example, if a person is guilty of premeditated murder and is shown to have been guilty of additional aggravating misconduct, then he becomes part of a narrower, less numerous class of persons eligible for the death penalty. But a person convicted of felony murder who then has the same felony used against her as an aggravator does not become a member of a smaller group. Rather, the felony aggravator used there would make the entire larger group of felony murderers automatically eligible for the death penalty without proof of any additional aggravating *1266 misconduct. Hence, the felony aggravator serves no legitimate narrowing function in such a case.
Id. at 12 (last emphasis supplied).
Unlike the felony murder conviction in this case, a conviction of premeditated murder does not automatically make the defendant eligible for the death penalty. This Court has made clear that the aggravating circumstance that the murder was committed in a cold, calculated and premeditated manner "encompasses something more than premeditated first-degree murder." Jackson v. State, 648 So.2d 85, 89 (Fla.1994). "There simply is no rational basis for treating a felony-murder offender more harshly than a premeditated killer." Blanco, 706 So.2d at 13 (Anstead, J., specially concurring).
In this case, a jury found Douglas guilty of first-degree felony murder with sexual battery as the underlying felony. During the penalty phase, the jurors were instructed that they could consider that the crime was committed during a sexual battery as an aggravating factor, and the trial court subsequently found this aggravator in its sentencing order. These circumstances make this case distinguishable both from cases such as Blanco in which the defendant is found guilty of first-degree murder by general verdict where there is sufficient evidence of premeditation,[13] and from cases in which the defendant is convicted of multiple contemporaneous felonies.[14] Under either of those circumstances, the felony supporting the aggravator is an additional factor which genuinely narrows the class of murderers eligible for the death penalty. The same cannot be said in this case, and I therefore conclude that as applied to Douglas, the murder in the course of a felony aggravator is unconstitutional under the Eighth Amendment.[15]
*1267 In addition to the Eighth Amendment concern expressed above, I conclude that in light of Ring, the Fifth Amendment prohibition on double jeopardy bars reliance on the sexual battery to support both Douglas's felony-murder conviction and the aggravating circumstance that the murder was committed during the course of a felony. In Ring, the Supreme Court held that "[b]ecause Arizona's enumerated aggravating factors operate as `the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609, 122 S.Ct. 2428 (citation omitted); see also Sattazahn v. Pennsylvania, 537 U.S. 101, 111, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) ("[F]or purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of `murder' is a distinct, lesser included offense of `murder plus one or more aggravating circumstances': Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.") (Scalia, J., joined by Rehnquist, C.J., and Thomas, J.). Thus, under Ring the aggravating circumstances in section 921.141, Florida Statutes (2003), are alternative elements of the greater offense of capital murder.
Although several Justices on this Court have expressed the view that a first-degree murder conviction itself makes a defendant death eligible,[16] I conclude that this interpretation cannot be reconciled with the Eighth Amendment requirement that aggravators be found in order to impose a death sentence. As I explained in Bottoson,
[o]n this initial essential question of the maximum penalty for first-degree murder, I must conclude that the maximum penalty after a finding of guilt in Florida is life imprisonment. The death penalty for first-degree murder cannot be imposed unless and until additional factual findings are made as to the existence of aggravators that outweigh the mitigators  just as in Arizona. I would thus recede from our decision in Mills [v. Moore, 786 So.2d 532 (Fla.2001),] to the extent that Mills held first that Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] did not apply to capital sentencing and second that the maximum penalty for first-degree murder in Florida is death. See Mills, 786 So.2d at 537-38. The statement in Mills as to the maximum penalty may be true in form, but through the lens of Ring the statement is not true in effect.
833 So.2d at 722 (Pariente, J. concurring in result only).
In light of Ring, first-degree murder must now be viewed as a wholly subsumed lesser included offense of capital murder (first-degree murder plus one or more aggravating circumstances). Thus, I conclude that it is constitutionally impermissible to rely on the same underlying felony to support both the first-degree murder conviction and the aggravating circumstance. The effect of Ring is similar to the prohibition against imposing an enhanced sentence for the use of a weapon or *1268 firearm where an essential element of the underlying felony is the use of a weapon or firearm.[17] The trial court's use of the murder in the course of a felony aggravator in this case both prevents the aggravator from performing the narrowing function required by the Eighth Amendment and impermissibly relies on the same felony to support both Douglas's first-degree murder conviction and the greater offense of first-degree murder punishable by death in violation of the Fifth Amendment Double Jeopardy Clause. I would therefore strike this aggravating circumstance.
Striking this aggravator necessitates a harmless error analysis. See Demps v. Dugger, 714 So.2d 365, 367 (Fla.1998) (stating that the Court properly applied the harmless error analysis on direct appeal after striking two of the aggravating circumstances found by the trial court); see also Ring, 536 U.S. at 609 n. 7, 122 S.Ct. 2428 (leaving initial determination of harmlessness to the lower courts); State v. Ring, 204 Ariz. 534, 65 P.3d 915, 941-42 (2003) (concluding that in those instances in which no reasonable jury could find that the state failed to prove aggravators of pecuniary gain motive or commission of multiple homicides beyond a reasonable doubt, appellate court will find harmless error affecting that factor). In the sentencing order, the trial court relied heavily on the "manner and circumstances under which the Defendant chose to murder Ms. Hobgood," in finding that the death penalty was the appropriate sentence. The trial court expressly found that the "sole aggravating factor that the murder was especially heinous, atrocious, or cruel substantially outweighs the mitigating circumstances found to exist." Thus, it is clear that the trial court would have sentenced Douglas to death absent the murder in the course of a felony aggravator.
Further, the circumstances under which Hobgood was killed lead me to conclude beyond a reasonable doubt that the jury would have unanimously found HAC proven in this case. The evidence presented at trial established that while she was alive, Hobgood received at least ten separate blows to her face, seven blows to the back of her head and seven to ten blows to her hands and arms. In addition, her jaw and nose were broken, several of her teeth had been knocked out and her right shoulder was dislocated. Although Douglas argues that Hobgood could have been rendered unconscious by the first blow, the medical examiner testified that this was inconsistent with the defensive type injuries found on Hobgood's hands and forearm as well as with the fact that there were injuries to all sides of her head, which indicated that she was rolling from side to side. The beating death of a conscious victim, such as occurred in this case, is the epitome of HAC.
Lastly, I conclude that Douglas's death sentence is proportionate despite the fact that I would strike the murder in the course of a felony aggravator. Although *1269 Douglas's death sentence now rests on a single aggravating circumstance, HAC is a weighty aggravator. See Morton v. State, 789 So.2d 324, 331 (Fla.2001). Further, the mitigation is this case is not what I consider "substantial." Cf. Almeida v. State, 748 So.2d 922, 933 (Fla.1999) ("As a general rule, death is not indicated in a single-aggravator case where there is substantial mitigation.") (internal quotation marks omitted). Cases in which this Court has vacated the death sentence involving the single HAC aggravator have included more significant mitigation than found by the trial court in this case. See, e.g., Penn v. State, 574 So.2d 1079, 1083-84 (Fla.1991) (death sentence not proportionate where sole aggravator was HAC and mitigation included evidence of heavy drug use); Smalley v. State, 546 So.2d 720, 721, 723 (Fla.1989) (death sentence not proportionate where sole aggravator was HAC and mitigation included evidence of drug use and of extreme mental or emotional disturbance). Moreover, this Court recently upheld the death sentence in a case in which HAC was weighed against several nonstatutory mitigators, including that the defendant was under extreme mental or emotional disturbance at the time of the murder. See Butler v. State, 842 So.2d 817, 833 (Fla.2003). Although I dissented on the issue of proportionality in Butler, I did so based on my conclusion that there was strong evidence that Butler was impaired by alcohol and cocaine, and that the majority appeared to rely on impermissible nonstatutory aggravation. See id. at 840-41 (Pariente, J. concurring in part and dissenting in part). I find the circumstances presented in this case distinguishable.
Because I conclude beyond a reasonable doubt that the trial court would have imposed the death penalty absent the murder in the course of a felony aggravator and that the jury would have found the HAC aggravator, and because death remains a proportionate punishment in this case even after striking the murder in the course of a felony aggravator, I concur in the affirmance of Douglas's death sentence.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
[2] Douglas is African-American and Hobgood was Caucasian.
[3] As a result, Jones was arrested and charged with perjury and accessory after the fact. Jones pled guilty to the accessory charge and the perjury charge was dropped. Jones had not been sentenced at the time of Douglas's trial and was facing a maximum sentence of seven years' imprisonment
[4] Dr. Martin Tracey, an expert in population genetics, confirmed Petree's results and explained the significance of the probabilities calculated in this case:

Given that there are about six billion people on the planet earth at this time, give or take a million or so probably given that it's an estimate, when you are talking in terms of quadrillions as the expectation for randomly drawing another person, that means you would expect to look through something in the neighborhood of a million copies of the planet's current population before you would find another individual who would match that genetic profile.
[5] Specifically, the jury did not check the option on the verdict form that stated that the killing was premeditated.
[6] These witnesses were: (1) Charlie McCloud, Douglas's brother-in-law; (2) Janice Williams, Douglas's maternal aunt; (3) John Williams, Douglas's uncle by marriage; (4) Tammy Wright, a close friend; (5) Joyce Douglas, Douglas's sister-in-law; (6) Sandra Wright, a friend of the family; (7) Lavern Montgomery, Douglas's brother-in-law; (8) Matthew McKever, Douglas's stepfather; (9) James Douglas, Douglas's brother; (10) Lavonia Montgomery, Douglas's sister; (11) Roy Smith, Douglas's maternal uncle; and (12) Sheryl McKever, Douglas's mother.
[7] Spencer v. State, 615 So.2d 688 (Fla.1993).
[8] The mitigating circumstances rejected by the trial court were: (1) Douglas's father left the home when Douglas was nine years old (not mitigating); (2) Douglas's father did not spend a significant amount of time with Douglas after he left the home (not mitigating); (3) Douglas loves his children (not proven); (4) Douglas is a good father to his children (not proven); (5) Douglas supports his children by buying food, diapers and other items (not proven); (6) Douglas is a positive, upbeat person (not proven); (7) Douglas has worked at several different jobs (not mitigating); (8) Douglas has an outgoing, friendly personality (not proven); (9) Douglas is and always has been respectful to his elders (not proven); (10) Douglas has been a good son to his mother and is protective of her (not proven); (11) Douglas has been a good brother to his siblings (not proven); (12) Douglas was impaired by alcohol at the time of the crime (not mitigating); (13) Douglas has been courteous and pleasant to the courtroom personnel (not proven); and (14) codefendant Misty Jones entered a guilty plea to the charge of accessory after the fact and will receive a maximum sentence of seven years' imprisonment (not proven).
[9] The trial court also sentenced Douglas to life imprisonment for the sexual battery.
[10] Section 775.051, Florida Statutes (2003), which became effective on October 1, 1999, provides in full:

Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense, except when the consumption, injection, or use of a controlled substance under chapter 893 was pursuant to a lawful prescription issued to the defendant by a practitioner as defined in s. 893.02.
[11] These mitigating circumstances are: (1) Douglas was abused by his father both psychologically and physically; (2) Douglas witnessed his father commit acts of domestic violence against his mother; (3) Douglas and his siblings were afraid of their father when they were children; (4) Douglas's father was arrested for child abuse after beating Douglas with a belt; (5) Douglas's father sexually abused Douglas's oldest sister for seven years and was eventually arrested for the crime; and (6) the revelation of the sexual abuse of Douglas's oldest sister had a devastating impact on Douglas and the rest of his family.
[12] During oral argument, Douglas pointed to this Court's decision in Wilson v. State, 493 So.2d 1019 (Fla.1986), to support his argument on proportionality. In Wilson, this Court concluded that the death sentence was not proportionate where the trial court correctly found two aggravators (HAC and prior violent felony) and no mitigation. See id. at 1023. However, as we later explained in Evans v. State, 838 So.2d 1090, 1098 n. 6 (Fla.2002), cert. denied, ___ U.S. ___, 124 S.Ct. 121, 157 L.Ed.2d 84 (2003), we receded from Wilson"[t]o the extent that the proportionality analysis in ... Wilson ... rest[ed] on a `domestic dispute exception to the imposition of the death penalty' that this Court has disavowed in Spencer [v. State, 691 So.2d 1062 (Fla.1996)]." In Evans, this Court upheld the death penalty where the trial court weighed two aggravating circumstances (prior violent felony and murder committed while on probation) against five nonstatutory mitigators. See 838 So.2d at 1097-98.
[13] See Blanco, 706 So.2d at 12 n. 20 ("This Court has previously found the evidence sufficient in this case to prove premeditated murder.") (Anstead, J., specially concurring); see also Nelson v. State, 850 So.2d 514, 534 n. 13 (Fla.) ("Because the jury found Nelson guilty of first-degree murder on a general verdict form and the evidence is sufficient to establish premeditated murder, the concerns expressed by Justice Anstead as to the use of the `murder in the course of a felony' aggravator in a case in which the defendant is guilty of only felony murder are not present here.") (Pariente, J., specially concurring), cert. denied, ___ U.S. ___, 124 S.Ct. 961, 157 L.Ed.2d 797 (2003).
[14] See e.g., Parker v. State, 873 So.2d 270, 286 n. 12 (Fla. 2004) (noting that the trial court relied only on the defendant's kidnapping conviction in finding the murder in the course of a felony aggravator, whereas the jury's verdict finding the defendant guilty of first-degree murder was supported, under felony murder, by robbery in addition to kidnapping.)
[15] In response to Justice Wells's assertion that my views contravene Blanco's recognition of the Legislature's authority to define death-qualifying aggravating factors, I do not question whether the Legislature may specify murder in the course of specified felonies as an aggravating circumstance. I merely conclude that the aggravator is unconstitutional as applied in this case. This conclusion fully comports with the role of this Court, which is to review legislation for compliance with the United States and Florida Constitutions, where the issue is properly placed before us. Although legislation must be presumed constitutional, deference to the Legislature cannot supplant judicial review. Further, I disagree with Justice Wells that the grounds on which I would strike this aggravator were rejected in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Lowenfield concerned whether the death-qualifying aggravating circumstance may be found during the guilt phase as opposed to the penalty phase. That issue is not before us. Finally, regarding Justice Wells's reliance on Bertolotti v. Dugger, 883 F.2d 1503 (11th Cir.1989), the Eleventh Circuit's rejection of the claim that the aggravator fails to sufficiently narrow the class of death eligible defendants in that case is not binding on this Court. See State v. Dwyer, 332 So.2d 333, 335 (Fla.1976) ("Even though lower federal court rulings may be in some instances persuasive, such rulings are not binding on state courts.").
[16] See, e.g., Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003) (rejecting the defendant's argument that "under Florida law, a life sentence is the maximum penalty under section 775.082, Florida Statutes (1985), and therefore aggravating circumstances necessary for an enhancement to a death sentence are elements of the crime.") (per curiam opinion in which Wells, Lewis, and Quince, JJ., and Harding, Senior Justice, concurred).
[17] See State v. Tripp, 642 So.2d 728, 730 n. 2 (Fla.1994) (stating that reclassification of the defendant's attempted armed robbery conviction because the defendant used a deadly weapon was improper because "attempted armed robbery is a felony in which the use of a weapon is an essential element"); Gonzalez v. State, 585 So.2d 932, 933 (Fla.1991) (holding it was impermissible to enhance the defendant's third-degree murder conviction to a first-degree felony based on the use of a firearm where "the jury was instructed that the use of a firearm was an essential element of third-degree felony murder"); Tunsil v. State, 797 So.2d 651, 652-53 (Fla. 3d DCA 2001) (holding that under Gonzalez"it was impermissible to enhance the third degree murder on account of the use of a firearm, as the use of a firearm had already been taken into account in the underlying charge of aggravated assault with a firearm").