# Supreme Court of Florida

_____

No. SC2022-1547
_____

**LEO L. BOATMAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 17, 2024

PER CURIAM.

Leo L. Boatman appeals his conviction and death sentence for the first-degree premeditated murder of William L. Chapman, a fellow inmate in Florida State Prison.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  We affirm.[1]

## I.  BACKGROUND

The murder took place on July 5, 2019, in the dayroom in the prison's I-Wing.  Unsurprisingly, the relevant events were largely

---

1.  Boatman does not appeal his separate conviction and sentence for one count of Possession of a Weapon by a State Prisoner.  *See* § 944.47(1)(c), Fla. Stat. (2019).

captured on video—by the dayroom camera, a camera in the hallway outside the dayroom, and a handheld device outside the dayroom. The videos show Boatman, along with codefendant William E. Wells, attacking Chapman for approximately twelve minutes with a ligature and two shanks (metal rods), while approximately ten other inmates look on.[2] During the attack, Boatman prevented correctional officers (COs) from entering the dayroom by blocking the inward-opening door—the only method of ingress and egress—with his foot. Wells later did the same.

During Boatman's post-murder interview with law enforcement, he explained that he and Wells decided to commit murder after they were denied their respective reviews to be released from Close Management (CM) level 3 confinement status and into the general prison population.[3] Boatman also explained

---

2. Wells, who was similarly convicted and sentenced to death for the Chapman murder, had his conviction and sentence affirmed last year. *Wells v. State*, 364 So. 3d 1005 (Fla.), *cert. denied*, 144 S. Ct. 385 (2023).

3. Testimony established that Florida State Prison is a maximum-security prison. There are two open population dorms, and a small section of the prison is "max management," which is the most restrictive confinement. Most of the prison is CM, which falls between max management and open population. There are

they originally selected a different victim (Maurice "Smurf" Bell) but, days before the murder, decided to kill Chapman after Chapman "tried" Boatman by passing a "kite"[4] suggesting Chapman and Smurf were going to attempt to recruit Boatman into performing sexual favors for them.

At trial, defense counsel largely argued the murder was "generally heat of passion, provocation, or self-defense." But the jury rejected any such defense and convicted Boatman of premeditated first-degree murder. A few days into the penalty phase, Boatman waived the jury for the remainder of the penalty phase. The judge later sentenced Boatman to death.

### Guilt Phase

The State presented the testimony of six witnesses—three individuals who worked at the prison on the night of the murder, two Florida Department of Law Enforcement (FDLE) special agents (David Meacham and Garrett Carlisle), and the medical examiner

---

three types of CM, with CM3 being the least restrictive. Boatman, Wells, and the other inmates in the dayroom at the time of the murder were all CM3.

4. "Kites" are messages that inmates send between cells.

(Dr. William Hamilton).  The State also introduced, among other things, photographs, a handful of videos, and audio of Boatman's interview with Special Agents Meacham and Carlisle.  As outlined by the trial court, the evidence established as follows:

On July 5, 2019, the Defendant, along with his co-defendant, William E. Wells, entered the dayroom in I-Wing in Florida State Prison with the premeditated intent to kill the victim, William Chapman.  Florida State Prison is a maximum-security prison.  And, at the time of the murder, the Defendant was serving two life sentences for first-degree murders which he committed in Marion County, Florida.  Additionally, the Defendant was on Close Management (level 3) at the prison.

Upset that their Close Management level would not be reduced, the Defendant and Wells decided to kill a fellow inmate as an act of revenge against the Department of Corrections.  Ultimately, they chose inmate William Chapman as the intended victim because he had "tried"/disrespected the Defendant on the prison wing.  In preparation for the murder, the Defendant and Wells acquired shanks and ligatures to facilitate the killing.  It appears that the Defendant acquired the shanks (metal rods) while Wells acquired the ligatures.  The Defendant would not disclose from where he obtained the shanks.

The events which occurred on July 5, 2019, were captured on video (both inside the dayroom and in the hallway outside the dayroom).  The dayroom video reflects the Defendant, his co-defendant Wells, the victim, and approximately 10-12 other inmates in the dayroom before the attack began.  The dayroom's singular door is the only entry and exit point into the room.  Approximately ten minutes before the attack began, the Defendant leaves the dayroom with a correctional officer to go to the bathroom; and he returns

two minutes later.  After the Defendant returns to the room, Wells leaves the room and is escorted to the bathroom.

Once Wells returns to the room, the Defendant walks over to the victim, speaks to him, and the two walk out of the dayroom camera's view into an area that contains a blind spot.  Wells then moves toward where the Defendant and Chapman are standing and wraps a white ligature around Chapman's neck.  While Wells is strangling Chapman, the Defendant begins punching him.  Chapman can be seen struggling as the two co-defendants are choking and hitting him.  The Defendant then moves in front of the dayroom door, blocking it with his foot.  He then pulls out two large shanks, one in each hand, tied to his wrists.  The Defendant tied the shanks to his wrists to prevent Chapman from taking them from him during the attack.  During the attack, correctional officers unsuccessfully attempted to open the dayroom door, blocked by the Defendant with his body and foot.  Further, the Defendant threatened the officers, telling them that he and Wells intended to kill Chapman ("This guy's going to die today"); and if they entered the dayroom they would be killed, or harmed, as well.  As the attack continued, the Defendant and Wells stabbed Chapman in his eyes, neck, torso, back, and face.  Although the correctional officers were ordering the Defendant to stop, the Defendant persisted in viciously attacking Chapman.

At this point, correctional officers were able to slightly open the dayroom door and deploy a chemical agent into the room.  Once the door was ajar, Chapman places his fingers in the gap, trying to open the door and escape.  However, Chapman was unable to get away from the Defendant and Wells' attack.  Wells then began leaning against the dayroom door while the Defendant continued stabbing Chapman.  The Defendant then gives Wells one of the shanks.  Wells begins stabbing Chapman, ultimately leaving one of the shanks in the victim's neck.  As he and Wells are stabbing Chapman,

the Defendant continues to communicate with the correctional officers who were situated outside of the dayroom door. Ultimately, Chapman falls to the floor; and the Defendant and Boatman take a short break. The Defendant can be seen on the dayroom video, covered in the victim's blood, appearing to revel in what he has done. The Defendant subsequently stomps on the victim seven times. After which, he stabs the victim with the second shank, leaving it in the back of his neck. The Defendant then stomps on the shank with such strength that it bends the metal. The entire attack lasted approximately 12 minutes.

Once the Defendant and Wells were certain that Chapman was dead, they allowed the correctional officers into the room. Ultimately, Chapman was unable to be revived. And it was determined that his death was the result of being beaten, stabbed, and strangled. The medical examiner testified that Chapman had multiple traumas to his head, neck, eyes, face, and body, including: 25 stab wound/cuts on the right-side of his neck; 13 stab/cut wounds on the back of his neck; a penetrating injury to his neck by a metal rod (which was still in the victim's neck at the time of the autopsy); a deep ligature furrow in his neck (indicating that he had been strangled with a ligature); hemorrhaging around the eyes (the eyes themselves were intact); internal injuries (brain hemorrhaging caused by blunt force trauma[)]; and multiple torso injuries (both internal and external) caused by penetrating injuries due [to] sharp force trauma. There were multiple modalities of injury and any of the more serious forms of blunt force trauma or sharp force trauma could have been the fatal act.

Hours after the murder, the Defendant was interviewed by FDLE Special Agents David Meacham and Garrett Carlisle. During the interview, the Defendant stated that he decided, after being required to stay on Close Management, that he was no longer going to put up with "the bullshit"; and that the next person who "crossed the line" would die. That person ended up being

William Chapman.  The Defendant felt betrayed by Chapman, whom he considered to be a friend.  According to the Defendant, Chapman was "an undercover fag" who was acting on behalf of another inmate to trick him and Wells into performing homosexual acts in exchange for coffee, and related items.  The Defendant further acknowledged that he had been planning the murder for up to a week prior, but at least for a few days.

Sentencing Order at 3-6.

For its part, the defense called five witnesses, including Boatman, in an unsuccessful attempt to establish "heat of passion, provocation, or self-defense."

Boatman largely testified to his chaotic upbringing—including being born in a mental institution; never meeting his father; and being sexually abused by multiple males and by his mother, beginning at age seven—and to prison life.  As to the latter, he testified that violent persons get respect, that weapons are needed for defense, that he is not gay, and that a straight inmate cannot wait long to act in retaliation after being propositioned by a gay inmate, otherwise others will begin propositioning you, eventually opening the door to someone "taking what they want" from you.  He explained why he thought Chapman—with whom he associated and who initially denied being gay—was a threat, including that

- 7 -

Chapman had battered a CO and stabbed another inmate. And Boatman testified he read the "kite" to mean Smurf was using Chapman to recruit Boatman for sex, and that the murder was something he thought he "had to do." On cross examination, Boatman conceded the first thing he told law enforcement about why he committed the murder was that he was upset about once again being denied release from CM confinement. He also explained that he and Wells originally targeted Smurf for "trying [Boatman] in a homosexual way," before they decided to kill Chapman.

Another defense witness, Dr. Tonia Werner, a psychiatrist who had diagnosed Boatman with an adjustment disorder, opined that being denied CM review and discovering a plan between inmates to sexually target you (after you have a history of sexual abuse) is a "stressor" that can trigger a heightened response.

The other three defense witnesses were the Assistant Warden (Jeffrey McClellan), who was not aware of any sexual battery on CM, and two inmates (Reginald Arline and Smurf).

As noted above, the jury rejected the defense's theory and convicted Boatman of first-degree premeditated murder.

## Penalty Phase

In the penalty phase, the State presented four witnesses. Agent Carlisle provided additional testimony regarding the Chapman murder, and the other three witnesses testified about Boatman's prior violent felonies inside and outside the prison system. Eric Dice, an officer with the Marion County Sheriff's Office, testified about the first-degree murders Boatman committed—using an AK-47—of a young couple in the Ocala National Forest in 2006. Joseph Lee Hamner, a retired Department of Corrections (DOC) inspector, testified regarding Boatman's conviction for attempted second-degree murder stemming from a 2009 incident at Cross City Correctional Institution, where Boatman was observed pulling on a sheet tied around the neck of a fellow inmate (Mark Apicella). And Kevin Michael Ortiz, a senior inspector with DOC, testified about Boatman's third-degree murder conviction stemming from a 2010 incident with a fellow inmate (Ricky Morris) at Charlotte Correctional Institution, where Boatman was seen slamming Morris's head into the concrete floor.

The defense called over a dozen witnesses. Three witnesses were fellow inmates, one of whom described the difference in

privileges between general population, CM, and death row.

Other defense witnesses, including several of Boatman's relatives, testified about Boatman's dysfunctional upbringing and the chaotic and abusive nature of his family. The testimony largely established the following.

Boatman was born in a mental hospital to a mother, Sheila, who was a long-term patient (Boatman's father may have been a patient). While pregnant with Boatman, Sheila likely took psychiatric drugs, did not get proper prenatal care, and consumed alcohol. Sheila's mother, Lucille, had six children with six different men and married between eight and ten times. Lucille was physically and verbally abusive to her children, and later to Boatman, whom Lucille ended up adopting (along with Boatman's sister).

When Boatman was seven years old, he began rebelling after his best friend was killed in front of him by a distracted driver. Other tragedies endured by Boatman as a child included Sheila's body being found in another state when Boatman was almost nine. After his mother's death, Boatman started getting into fights. Lucille eventually gave up her rights to Boatman, who ended up in

foster care (where he experienced further abuse) and later in the custody of the Department of Juvenile Justice (DJJ). When Boatman was released from DJJ custody at age nineteen, he earned enough credits to graduate from high school, got a job, and enrolled in community college. But he soon received two life sentences after committing the murders in the Ocala National Forest.

Another defense witness, retired judge Irene Sullivan—whose years on the bench included handling juvenile dependency and delinquency matters but who never interacted with Boatman while he was in the juvenile system—testified that she reached out to Boatman after he committed the Ocala murders, and they became pen pals. During Retired Judge Sullivan's testimony, defense counsel read to the jury some letters Boatman wrote to her about his life. Among other things, the letters outlined the sexual abuse Boatman experienced, including that perpetrated by his mother.

Other witnesses included: a woman who lived near Boatman's grandmother; a member of the team that represented Boatman in the Ocala murders; a mitigation specialist; and Dr. Werner, who reminded the jury about her adjustment-disorder diagnosis of Boatman.

Dr. Michael Quinones, a clinical psychologist who met with Boatman for two evaluation sessions, testified about Boatman's "chronically stressful, intensely reactive" development and opined that Boatman had 8 out of 10 Adverse Childhood Experiences (ACEs) that mental health professionals use in assessing an individual's later psychological, emotional, and health-related functioning. Dr. Quinones also opined that Boatman has difficulty controlling his impulses and has contended with lifelong "extreme" and "severe mental health issues and impairments."

Dr. Joseph Wu, a professor of psychiatry and human behavior who specializes in neuropsychiatry and neurocognitive imaging, reviewed a PET scan of Boatman's brain and "found many different kinds of abnormalities" consistent with different clinical neuropsychiatric diagnoses, including fetal alcohol spectrum disorder (FASD). Dr. Wu opined that Boatman "is a neurological perfect storm," the result of which is "a catastrophic breakdown . . . in terms of his ability to regulate his aggressive impulses" and conform his conduct, that "Boatman was under the influence of extreme mental or emotional disturbance," and that Boatman's capacity to conform his conduct to requirements of the law "was

- 12 -

substantially neurologically impaired."

Dr. Geoffrey Colino, a forensic neurologist who evaluated Boatman, opined that Boatman "no doubt . . . has FASD" and that he had suffered traumatic head injuries. Dr. Colino opined that Boatman meets the criteria for a diagnosis of fetal alcohol syndrome, the most severe form of FASD. According to Dr. Colino, someone like Boatman cannot stop himself from following through once a decision to act is impulsively made in response to a setting-off event—even if the action is deferred and involves planning—and the syndrome that most characterizes Boatman's behaviors is orbitofrontal cortex syndrome. Dr. Colino correlated his findings to the two statutorily enumerated mental health mitigators, namely that "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance," and "[t]he capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired." § 921.141(7)(b), (f), Fla. Stat. (2019) (respectively). But in doing so, Dr. Colino preferred to "change th[e] language" of those statutory mitigators to instead "use the idiom of neurology." Namely, he stated he "would

change" the language of section 921.141(7)(b) to say "under the influence of significant to profound neurological impairment/disturbance," and of section 921.141(7)(f) to say "conform his behavior to requirements not just of law but also to his own knowledge of right and wrong."

Not all the defense witnesses testified in front of the jury. After the defense's first five witnesses testified (including Boatman's sister), defense counsel informed the judge that Boatman desired to waive and dismiss the jury. The next day, after extensive colloquies with Boatman, the judge granted Boatman's waiver request.

## *Spencer*[5] **Hearing**

At the *Spencer* hearing, the defense presented additional argument, but neither the defense nor the State had any additional witnesses to call or evidence to present.

## **Sentencing**

On November 9, 2022, the court held a sentencing hearing, during which the court sentenced Boatman to death. The court found all four proposed aggravators were proven beyond a

---

5. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 14 -

reasonable doubt and assigned them weight as follows: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment (very great weight); (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (very great weight); (3) the capital felony was especially heinous, atrocious, or cruel (HAC) (very great weight); and (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight).

Regarding mitigation, the court first addressed five statutorily enumerated mitigating circumstances, finding four were not established by the evidence, namely: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) the victim was a participant in the defendant's conduct or consented to the act; (3) the defendant acted under extreme duress or under the substantial domination of another person; and (4) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. As to the fifth

- 15 -

statutorily enumerated mitigator—i.e., the age of the defendant at the time of the crime—the court concluded the mitigator was proven (Boatman was thirty-two years old) but gave it no weight.

The court then addressed any other factors in Boatman's background that would mitigate against imposition of the death penalty. *See* § 921.141(7)(h), Fla. Stat. The court found twelve such factors were established by the evidence and assigned them weight as follows: (1) courtroom behavior (some weight); (2) waived jury (some weight); (3) care for the community and family (some weight); (4) generational trauma (some weight); (5) brain malformation (little weight); (6) the circumstances of conception (or Boatman's perception of the circumstances of his conception) (some weight); (7) fetal alcohol syndrome (little weight); (8) instability in the home (some weight); (9) commitment to DJJ from age fourteen (some weight); (10) sexual abuse (some weight); (11) adverse childhood experiences (some weight); and (12) mercy (little weight).

As noted above, the trial court imposed a sentence of death for the murder. This appeal followed.

## II. ANALYSIS

Boatman raises fifteen issues, including the sufficiency of the

evidence to support the first-degree murder conviction.

**Motion to Adjudicate Boatman Incompetent to Proceed**

Boatman argues the trial court erred in denying his motion to adjudicate him incompetent to proceed, given that Dr. Werner opined that he was incompetent to proceed. We conclude that no reasonable grounds to question Boatman's competence were presented. Indeed, Dr. Werner's report and testimony make clear that Boatman was not incompetent to proceed. The trial court thus did not err in denying Boatman's motion.

Two years before the guilt-phase trial commenced, Boatman filed the motion, attaching a report by Dr. Werner, who, at the request of defense counsel, evaluated Boatman for the stated purpose "of opining on competency to proceed." In her report, Dr. Werner addressed the statutorily enumerated competence factors in section 916.12(3), Florida Statutes (2019). Although her findings regarding those factors all suggested Boatman was competent to proceed, Dr. Werner, who diagnosed Boatman with an adjustment disorder, opined that he was incompetent to proceed. She explained that adjustment disorders feature "[t]he presence of emotional and behavioral symptoms in response to an identifiable

- 17 -

stressor," and she identified Boatman's stressor as "being held in close management" with "no identifiable end." She noted Boatman was "stating his intent to plead guilty in an effort to be moved to death row," where he felt "he will have more freedom." And she concluded that his "choice of plea" was not "free and rational."

At a hearing two days after the motion was filed, Dr. Werner conceded that, aside from the potential plea, she had no issues with Boatman's competence to participate in a trial. After some discussion, the judge recognized that Dr. Werner's opinion was wholly detached from her report and testimony. The judge further stated that Boatman had "always manifested appropriate courtroom behavior" and that there was no "factual basis" to otherwise "question" his "competency to go forward." The judge ultimately rejected the notion that he "must find [Boatman is] incompetent to proceed based [solely] upon [Dr. Werner's report and testimony]," given that Dr. Werner herself gave "overwhelming evidence" to the contrary. The judge left open the possibility of appointing a doctor if later necessary. But nothing in the evidence presented at the hearing convinced the judge that was necessary. The judge then set a hearing date for one month later to discuss Boatman's

potential plea. No plea was entered at the subsequent hearing.

On this record, the trial court did not abuse its discretion in denying Boatman's motion and determining there were no reasonable grounds on which to further pursue the issue of potential incompetence. Indeed, this record suggests that defense counsel and Dr. Werner seemingly conflated the "competence" standard with the "heightened" standard for pleading guilty.

Recently, we explained that "the standard for competence to stand trial . . . is the same standard of competence required to plead guilty." *Noetzel v. State*, 328 So. 3d 933, 945-46 (Fla. 2021). There is also "a 'heightened' standard for pleading guilty," but that heightened standard "is not a heightened standard of *competence*." *Godinez v. Moran*, 509 U.S. 389, 401 (1993). Rather, the heightened standard means that "[i]n addition to determining that a defendant who seeks to plead guilty . . . is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Id.* at 400 (citing *Parke v. Raley*, 506 U.S. 20, 28-29 (1992); *Faretta v. California*, 422 U.S. 806, 835 (1975)). Whether Boatman met that heightened standard is not at issue—he never pleaded guilty. We deny this claim.

## Motion to Disqualify

Boatman asserts that the judge erred in denying his motion to disqualify and that he "did not receive a just and fair trial."

"The standard of review for a trial judge's decision on a motion to disqualify is *de novo.*" *Davis v. State*, 347 So. 3d 315, 322 (Fla. 2022) (citing *Gore v. State*, 964 So. 2d 1257, 1268 (Fla. 2007)). Florida Rule of General Practice and Judicial Administration 2.330 requires the movant to "allege specifically the facts and reasons upon which the movant relies as the grounds for disqualification." Fla. R. Gen. Prac. & Jud. Admin. 2.330(c)(2). The judge against whom the motion is directed "may determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged." Fla. R. Gen. Prac. & Jud. Admin. 2.330(h). In determining legal sufficiency, the judge "must consider 'whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial.' " *Davis*, 347 So. 3d at 322 (quoting *Livingston v. State*, 441 So. 2d 1083, 1087 (Fla. 1983)).

Boatman's motion—which included his sworn statement—set forth a portion of a conversation between the judge and defense counsel at a pretrial conference on July 28, 2021, "to discuss the

readiness of Mr. Boatman's case for an August trial." After counsel argued for a continuance, the judge expressed a reluctance to grant it. The judge, while outlining his recollections of counsel's representations at prior conferences and inviting counsel to respond, questioned whether counsel was "like sort of willfully putting [himself] in a position to continue to state [they] are not ready," and noted it was difficult "to discern between legitimate not ready and [counsel] engaging in a scheduling strategy." After co-counsel stated the defense was not "even close to being ready," the judge responded that the defense had for five months been saying they were "extraordinarily close." The motion alleged that this response "mischaracterized the previous representations by [counsel]." The court denied the motion, citing cases for the proposition that coaxing counsel to get a case to trial or to resolve discovery issues does not create a well-grounded fear of bias.

We conclude that Boatman's motion was legally insufficient. The motion at most alleged—without adequate explanation—that the judge "mischaracterized" certain prior statements. In that regard, Boatman failed to "allege specifically the facts and reasons upon which [he] relie[d]." Fla. R. Gen. Prac. & Jud. Admin.

2.330(c)(2). In any event, the cases cited by Boatman are distinguishable in that they involved judges who had preconceived notions of credibility or had a self-admitted bias. *See, e.g., Brown v. St. George Island, Ltd.*, 561 So. 2d 253, 257 (Fla. 1990) (disqualifying judge where movant asserted counsel sought to submit movant's affidavit and that judge "without having heard testimony from [movant], tossed the affidavit back and said, 'If [movant] were here I wouldn't believe him anyway' ").

Here, Boatman alleged in his motion that the judge expressed frustration with and invited an explanation from counsel regarding prior representations on the topic of scheduling and trial readiness. Although it has been said that "a statement by a trial judge that he or she feels a party has lied in the case is generally regarded as indicating a bias against the party," *Campbell Soup Co. v. Roberts*, 676 So. 2d 435, 436 (Fla. 2d DCA 1995), that proposition does not apply here.

Even if counsel never said the defense was "extraordinarily close," the judge's frustration centered around the defense failing to calendar depositions the defense represented would be completed. This additional context supports the denial of the motion. *See Wall*

- 22 -

*v. State*, 238 So. 3d 127, 143 (Fla. 2018) ("[T]he context of the hearing and history of the case as reflected in the record are relevant to understanding whether a movant has a well-founded fear of judicial bias.").

The judge's comments "contain clear qualifiers," *Pilkington v. Pilkington*, 182 So. 3d 776, 779 (Fla. 5th DCA 2015), and the judge did "not make any decisions based upon first impressions," *id.*, instead agreeing to take the defense's "request under advisement." Boatman's sworn statement that he subjectively "felt that" the judge accused counsel "of being liars" is insufficient. *See Krawczuk v. State*, 92 So. 3d 195, 201 (Fla. 2012) ("The subjective fear of a party seeking the disqualification of a judge is not sufficient." (quoting *Parker v. State*, 3 So. 3d 974, 982 (Fla. 2009))). We deny this claim.

### Motion to Exclude Photographs and Video

Boatman argues the court erred in denying his motion in limine that sought to exclude "crime-scene and autopsy photographs and video" as "gruesome, inflammatory and unnecessary." At a hearing, defense counsel offered little argument regarding video of the murder, and, with respect to the photos— which counsel had not seen—"ask[ed] that [the State] produce [the

- 23 -

photographs] in advance." The judge ultimately outright denied the motion with respect to "the video that captures the event that Mr. Boatman is charged with." And as to the photos, the judge merely "denied without prejudice" the motion, indicated the State was to identify the photos, and invited defense counsel "to re-raise" any issues regarding any specific photos.

A trial court's ruling on a motion in limine is reviewed for an abuse of discretion. *Joseph v. State*, 336 So. 3d 218, 228 n.7 (Fla. 2022). Here, the trial court did not abuse its discretion.

Although a trial court's "discretion is limited by the rules of evidence," *Patrick v. State*, 104 So. 3d 1046, 1056 (Fla. 2012), Boatman misstates the rules of evidence. He largely argues the photos and video "were not necessary." But "[t]he test for admissibility of photographic evidence is relevancy rather than necessity." *Smith v. State*, 28 So. 3d 838, 861 (Fla. 2009) (quoting *Douglas v. State*, 878 So. 2d 1246, 1255 (Fla. 2004)). Here, the videos of the crime itself were plainly relevant—including to establish the disputed element of premeditation—and their probative value was not "substantially outweighed by the danger of

unfair prejudice." § 90.403, Fla. Stat. (2019). As to the photos, no definitive ruling was even made. We deny this claim.

## Motion to Preclude Penalty Phase

Boatman argues the trial court erred in denying his motion to preclude the State from seeking the death penalty should the State secure a conviction of first-degree murder. His motion asserted that because the indictment failed to allege aggravating factors, the indictment could only support a maximum sentence of life in prison. The gist of his argument was that in the wake of *Hurst v. Florida*, 577 U.S. 92 (2016), and this Court's decision on remand in *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020), aggravators under section 921.141 are "elements" that must be charged in the indictment.

This Court has repeatedly rejected this claim, both before and after deciding *Hurst v. State*. *See, e.g.*, *Cruz v. State*, 320 So. 3d 695, 730 (Fla. 2021); *Pham v. State*, 70 So. 3d 485, 496 (Fla. 2011). "We decline to revisit" this issue. *Cruz*, 320 So. 3d at 731.

## Motion for Individual and Sequestered Voir Dire

Boatman argues the court erred in denying his motion seeking individual and sequestered voir dire to "inquir[e] into the

prospective jurors' views on the death penalty as well as to any pre-trial publicity concerning . . . this case." The judge denied the motion but instructed both parties to come up with a summary to be "read to the courtroom of prospective jurors to try to trigger whether or not they are aware of anything." The judge also made clear that if any prospective "juror indicate[d] . . . a specific unique familiarity with the case," it would be discussed "in a sequestered and individualized format." The parties later submitted very similar summaries, except the defense included two sentences the judge deemed not relevant and thus declined to read.

A trial court's decision regarding "whether prospective jurors must be questioned individually about publicity the case has received" is reviewed for abuse of discretion. *Bolin v. State*, 736 So. 2d 1160, 1164 (Fla. 1999) (citing *Pietri v. State*, 644 So. 2d 1347, 1351 (Fla. 1994)). "Individual voir dire to determine juror impartiality in the face of pretrial publicity is constitutionally compelled only if the trial court's failure to ask these questions renders the trial fundamentally unfair." *Id.* (citing *Mu'Min v. Virginia*, 500 U.S. 415, 430 (1991)). Here, the trial court did not abuse its discretion. The decisions cited by Boatman, namely the

Supreme Court's decision in *Mu'Min* and this Court's decision in *Bolin*, simply do not support reversal.

Among other things, *Mu'Min* held "that the *voir dire* examination conducted by the trial court . . . was consistent with [the Due Process Clause of the Fourteenth Amendment]." 500 U.S. at 431-32. There, in a case involving forty-seven news articles and "substantial" publicity, *id.* at 418, 429-30, the trial court denied the petitioner's "motion for individual *voir dire*" and "ruled that *voir dire* would begin with collective questioning," with the venire then "broken down into panels of four, if necessary, to deal with issues of publicity," *id.* at 419. The trial court also "refused to ask any of petitioner's proposed questions relating to the content of news items that potential jurors might have read or seen." *Id.* Of the twelve seated jurors, eight "had at one time or another read or heard something about the case," but "[n]one had indicated that he had formed an opinion about the case or would be biased in any way." *Id.* at 421. Here, even assuming substantial pretrial publicity— nothing in Boatman's motion or briefing reflects actual substantial pretrial publicity—the judge went beyond the constitutionally compliant voir dire in *Mu'Min* by agreeing to a sequestered and

- 27 -

individualized format, if necessary.  And nothing suggests any juror "had formed an opinion about the case or would be biased in any way."  *Id.*

Bolin—which limited its holding to "the facts of th[e] case," 736 So. 2d at 1166—held that the trial court erroneously denied the defendant's "motion for individual and sequestered voir dire of prospective jurors who had been exposed to prejudicial pretrial publicity and who eventually served on [the] jury."  *Id.* at 1161.  But the publicity at issue involved newspaper articles containing "inadmissible and prejudicial information."  *Id.* at 1162-63.  Here, the court agreed to individual and sequestered voir dire, if necessary.  And there is no indication any juror was exposed to inadmissible and prejudicial information.  We deny this claim.

**Motion to Use Photographs and Video During Voir Dire**

Boatman claims the court erroneously denied his motion which asked that of the photographs or videos deemed admissible, the defense be permitted "to show a representative sample of crime-scene and autopsy photographs and/or relevant portion of the video of the crime to prospective jurors during voir dire and to question prospective jurors about their ability to deliberate fairly and

impartially after viewing those photographs." At a hearing, the court noted the risks of granting the request, including that publishing the information could result in the defense essentially "trying the case." The court denied the motion but ruled that both sides, "[a]t their discretion," could talk about it with prospective jurors "to properly evaluate their ability to consider mitigation and otherwise reach a lawful decision."

"The scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused." *Hoskins v. State*, 965 So. 2d 1, 13 (Fla. 2007) (quoting *Vining v. State*, 637 So. 2d 921, 926 (Fla. 1994)). Here, the trial court did not abuse its discretion. Indeed, *Hoskins* supports the trial court's decision.

In *Hoskins*, defense counsel "sought to show potential jurors [a graphic autopsy] photograph and ask whether it would cause them to vote for the death penalty." *Id.* at 12. The trial court denied the request but "did permit questioning about the effect of viewing graphic autopsy photographs." *Id.* at 13. In holding that "the trial court did not abuse its discretion," *Hoskins* reasoned in part that "defense counsel, in effect, sought an advance opinion of

the evidence" and that the trial court had not otherwise "restricted Hoskins's ability to determine the jurors' fairness." *Id.*

Here, defense counsel similarly "sought an advance opinion of the evidence," *id.*, namely "whether it would cause [the prospective jurors] to vote for the death penalty," *id.* at 12. The trial court properly denied the request while otherwise allowing counsel to discuss the information with potential jurors. And the record does not show that the court otherwise "restricted [Boatman's] ability to determine the jurors' fairness." *Id.* at 13. We deny this claim.[6]

**Motion to Strike the Jury Panel**

Boatman argues the court erred in denying defense counsel's ore tenus motion to strike the jury panel during voir dire. At the mid-afternoon bench conference during jury selection, after it became obvious that defense counsel needed many more hours for the initial voir dire, the judge and defense counsel discussed timing for the day. When the judge asked counsel if they were "going to be

---

6. As to the jurors ultimately seated, the judge stated for the record that no juror expressed any visible discomfort either when the defense "published three different videos" during defense opening or when the State later introduced the videos and photographs.

very, very late" and approximated 10:00 p.m., counsel responded: "Absolutely." After counsel stated his preference not to give the prospective jurors an exact time, the judge indicated the prospective jurors should be given some guidance to make necessary arrangements. Defense counsel "absolutely agree[d]" with the judge, who informed the prospective jurors accordingly. After the prospective jurors left for a recess, counsel made the motion, the gist of which was that the judge prejudicially informed the panel they would be staying late and that it was "entirely the defense's fault." Boatman's argument fails for at least three reasons.

First, any asserted error was "invited" and is therefore "unreviewable." *Allen v. State*, 322 So. 3d 589, 598 n.4 (Fla. 2021). Indeed, counsel "expressly" agreed to the judge's proposal. *Cf. Woodbury v. State*, 320 So. 3d 631, 653 n.10 (Fla. 2021) (concluding that "asserted error was invited" where defendant argued on appeal "that after the *Spencer* hearing, the trial court should have ordered a recess and convened a separate proceeding for imposition of the sentence," even though defendant "expressly objected to the court delaying the pronouncement of sentence and told the court to proceed directly to sentencing").

- 31 -

Second, any asserted error was cured. As such, "there is no basis for appellate relief." *Allen*, 322 So. 3d at 597. Here, defense counsel stated it "would be an excellent solution" if the judge gave the prospective jurors certain clarifying comments, which the judge did. Moreover, before the 5:00 p.m. break, the judge gave the panel the choice to stay "for however long that takes" or to "come back" the next morning. The panel chose to stay.

Third, any error was harmless. As the State notes, "the court did not inform the [prospective jurors] of anything that they would be unable to conclude on their own."

The cases cited by Boatman are easily distinguished. *See, e.g.*, *Richardson v. State*, 666 So. 2d 223, 224 (Fla. 2d DCA 1995) (involving an exchange between prosecutor and venire member "implying that [defendant] was a convicted felon who previously served time"). We deny this claim.

## Challenges for Cause

Boatman argues the court erred in denying his cause challenges of four potential jurors. Defense counsel used peremptory challenges to remove all four individuals. Later, when the defense was denied another cause challenge and requested an

additional peremptory, the court granted the request.

A ruling on a cause challenge is reviewed for an abuse of discretion. *Lowe v. State*, 259 So. 3d 23, 38 (Fla. 2018) (citing *Singleton v. State*, 783 So. 2d 970, 973 (Fla. 2001)). "Where the record demonstrates a reasonable doubt about a juror's ability to be impartial, the trial court abused its discretion in denying the cause challenge." *Hilton v. State*, 326 So. 3d 640, 654 (Fla. 2021) (citing *Carratelli v. State*, 961 So. 2d 312, 319 (Fla. 2007)). "[I]t is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (citing *Reynolds v. United States*, 98 U.S. 145, 157 (1879)). Even if a defendant establishes the erroneous denial of a cause challenge, the defendant must also "demonstrate . . . that the denial of the challenge resulted in prejudice." *Hilton*, 326 So. 3d at 654 (citing *Carratelli*, 961 So. 2d at 319). Here, even assuming this issue is adequately briefed, Boatman fails to establish error or prejudice.

For each of the four individuals, Boatman simply provides a transcript citation to where defense counsel, based on his recollection of the individual's responses, indicated the basis for the

cause challenge. Boatman does not mention the judge's differing recollection or provide citations to the individuals' actual responses. His failure to do so waives the issue. *See Barwick v. State*, 88 So. 3d 85, 101 (Fla. 2011) (rejecting, as "waived," a claim that was based in part on counsel's purported "failure to object to certain comments made by the State and the trial court," where defendant "d[id] not provide argument" and "failed to direct this Court's attention to the [comments]").

In any event, given the conflicting recollections of defense counsel and the judge—and after reviewing the uncited portions of the transcript—we cannot say "the record demonstrates a reasonable doubt about" any of the four potential jurors' "ability to be impartial." *Hilton*, 326 So. 3d at 654. For example, Boatman asserts one of the four prospective jurors stated that, among other things, "he thought it was a first-degree murder, then the death penalty comes with it." But according to the judge, that prospective juror was initially confused and, after explanation, "seemed to indicate he understood." That prospective juror did in fact clarify he "would feel obligated to" consider mitigation, that he was "confused earlier" about the penalty phase, and that it would be his

"duty to listen to everything." We remain mindful that the trial judge "is in a far superior position to properly evaluate the responses to the questions propounded to the jurors." *Cook v. State*, 542 So. 2d 964, 969 (Fla. 1989).

Even assuming any error occurred, to establish prejudice Boatman must "show that an objectionable juror has served on the jury." *Busby v. State*, 894 So. 2d 88, 96-97 (Fla. 2004) (citing *Trotter v. State*, 576 So. 2d 691 (Fla. 1991)). Said differently, he must show he "subsequently exhaust[ed] all of his . . . peremptory challenges and an additional challenge [was] *sought and denied*." *Hill v. State*, 477 So. 2d 553, 556 (Fla. 1985) (emphasis added). He cannot. Indeed, he was *granted* the only additional peremptory he requested.[7] We deny this claim.

### Evidentiary Issues in Guilt and Penalty Phases

Boatman claims numerous evidentiary errors occurred during

---

7. The State reads *Hill* as establishing a rule of per se reversible error in the context of erroneous denials of cause challenges and asks this Court to adopt a harmless error standard instead. Because *Hill* is plainly inapplicable here, where Boatman requested and was *granted* an additional peremptory, we decline the State's invitation to revisit *Hill*.

the guilt and penalty phases that singularly and cumulatively "infected" the trial and prejudiced him. But he largely just summarizes the proceedings and provides transcript quotations. To the extent his arguments are not waived, they are without merit. And any arguable error—singularly or cumulatively—was harmless in either phase. There is "no reasonable possibility" that any asserted errors "contributed to the conviction," *Figueroa-Sanabria v. State*, 366 So. 3d 1035, 1050 (Fla. 2023) (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986)), or "contributed to the death sentence," *Gaskin v. State*, 361 So. 3d 300, 309 (Fla. 2023).

Beginning with the guilt phase, Boatman's meritless claims include alleged violations of the best evidence rule. That rule requires the "original writing, recording, or photograph" to be introduced into evidence "to prove [its] contents." § 90.952, Fla. Stat. (2019); *Darling v. State*, 966 So. 2d 366, 383 (Fla. 2007) (recognizing section 90.952 as codification of the rule). Boatman conflates "best evidence" and "only evidence," wrongly suggesting a witness may never describe actions depicted in a video introduced into evidence. *Cf. Derrick v. State*, 335 So. 3d 801, 802 (Fla. 2d DCA 2022) ("A witness's in-court description of actions depicted in a

- 36 -

video recording . . . 'violates the best evidence rule' when offered to prove the crime *without introduction of the video in evidence.*" (emphasis added) (quoting *J.J. v. State*, 170 So. 3d 861, 862 (Fla. 3d DCA 2015))). Here, the rule does not preclude Special Agent Carlisle's testimony about certain introduced videos—taken prior to the attack—showing white athletic shoes being carried by Boatman to his cell and later being passed "to the direction of Mr. Wells's cell," with audio "that the[] shoes were for [Wells]," who was later wearing white athletic shoes during the attack. Carlisle explained why tennis shoes were part of the investigation, including that they "would help give an inmate better grip on the floor, if he was trying to block a door." Nor does the rule preclude the testimony of Sergeant Prock—a CO—regarding the first thing he saw when he arrived at the dayroom. Indeed, what Prock described took place in the blind spot of the dayroom camera and is not shown on video.

Boatman refers to the transcript of Special Agent Meacham's interview with Boatman but does not advance any argument. The trial court instructed the jury regarding the use of transcripts of recordings, allowed the audio to be published, and allowed the transcript to be followed along by the jury. Boatman does not allege

any transcript inaccuracy, let alone a material one.

Boatman takes issue with "the number of [autopsy] pictures" (and one x-ray) admitted during the medical examiner's testimony. The seven or so photos, which showed separate injuries, were not unfairly prejudicial. *See Smith v. State*, 320 So. 3d 20, 30-31 (Fla. 2021) (holding that trial court did not abuse its discretion in allowing twenty-six autopsy photos—most of which "identified separate injuries on [the victim's] body"—to be introduced during medical examiner's testimony).

Boatman also raises guilt-phase hearsay and Confrontation Clause arguments, none of which we find convincing. For example, he takes issue with Sergeant Prock testifying he "overhear[d] Mr. Boatman handing the weapon to Mr. Wells and telling him to -- he needed to stab the inmate as well." But for a statement to be hearsay, it must be offered "to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2019). Boatman's statement was introduced to establish premeditation, not to prove Wells needed to stab the victim. The statement is not hearsay.

As another example, Boatman takes issue with Special Agent

Carlisle explaining why he took photographs of the pipe chase.[8] Carlisle testified he "described to [one of the COs] what type of weapon would be about nine or ten inches long, made of -- possibly of brass, kind of like a gold metal, and [the CO] indicated it sounded like the plungers that were in the pipe chase." Even if Carlisle's testimony about what the CO said is hearsay that implicates the right to confrontation, any error was harmless. Whether the shanks Boatman used are pipe chase plungers or were obtained elsewhere did not possibly contribute to the conviction.

Boatman's evidentiary arguments pertaining to the penalty phase mostly involve hearsay and confrontation.[9] They center

---

8. According to Carlisle, the pipe chase in Boatman's dorm "runs in between two corridors of cells" and "houses all the plumbing -- basically the plumbing of the cell itself."

9. Section 921.141(1), Florida Statutes, recognizes that hearsay is admissible during the penalty phase "provided the defendant is accorded a fair opportunity to rebut any hearsay statements." This Court has broadly stated on several occasions that hearsay in the penalty phase must also satisfy the right to confrontation. *See, e.g., Rodgers v. State*, 948 So. 2d 655, 663 (Fla. 2006). Indeed, this Court has described as "uncontroverted" the "proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial." *Rodriguez v. State*, 753 So. 2d 29, 43 (Fla. 2000). We have no occasion here to reexamine our precedent, but we note that other courts disagree with that broad proposition. *See, e.g., Muhammad v. Sec'y, Fla.*

- 39 -

around the individuals who testified about his prior violent felony

convictions. Some of the testimony of those individuals recounted

statements made by others during the investigations of those prior

crimes. But even assuming there was hearsay that might implicate

the Confrontation Clause, any errors were harmless "given the

number of strong aggravators in this case," *Rodriguez v. State*, 753

So. 2d 29, 45 (Fla. 2000), the State's introduction of certified copies

of the prior convictions thus establishing the relevant aggravators,

and any hearsay being ancillary or cumulative to other evidence

about the prior convictions, including Boatman's own statements to

investigators about those crimes, *see Rodgers v. State*, 948 So. 2d

655, 663-65 (Fla. 2006) (holding that "hearsay testimony presented

in the penalty phase about [defendant's] prior manslaughter

conviction"—namely "the admission of [eyewitness's] statements

---

*Dep't of Corr.*, 733 F.3d 1065, 1074 (11th Cir. 2013) (concluding
that the Supreme Court's decision in *Williams v. New York*, 337
U.S. 241 (1949), and plurality opinion in *Gardner v. Florida*, 430
U.S. 349 (1977), "together stand for the proposition that a
defendant does not have a right to confront hearsay declarants at a
capital sentencing hearing, but that he does have a right to rebut
information relevant to his character and record that is admitted
against him").

through the [testimony of the] former investigating officer and assistant state attorney"—violated the Confrontation Clause but was harmless, where "the State introduced a certified copy of the prior manslaughter conviction, which established the prior violent felony conviction aggravator," and where eyewitness's statements were "merely cumulative to, and corroborative of, [defendant's] own admissions").

For example, Boatman takes issue with testimony from Inspector Ortiz regarding Boatman's conviction for the third-degree murder of inmate Ricky Morris at Charlotte Correctional. Ortiz, who arrived at the scene after the attack, testified about certain things said and done by the CO who discovered Morris facedown and bleeding in Boatman's cell and who witnessed Boatman continuing to beat Morris. Over objection, Ortiz testified the CO said that after Morris was discovered facedown and bleeding in Boatman's cell, "Boatman began to beat Morris some more," and that he (the CO) "tried to get attention from staff and that Boatman continued to beat Morris." But Boatman's own admissions were introduced, also through Inspector Ortiz, including Boatman telling investigators that after the CO "discovered them," Boatman "started

- 41 -

to slam Morris's head into the concrete floor." The CO's statements were "merely cumulative to, and corroborative of, [Boatman's] own admissions." *Rodgers*, 948 So. 2d at 665.

Boatman takes issue with six photos admitted during Detective Dice's testimony about the first-degree murders Boatman committed in the Ocala National Forest. The photos are of that crime scene and those two victims' bodies. Dice, who was involved in the investigation, testified that the photos were in the case file and accurately reflect what was described to him at the time of the investigation. Boatman's specific claim on appeal is unclear. He does not provide any authority to support a claim that hearsay was erroneously admitted or that the Confrontation Clause was violated; the photos were not a feature of the penalty phase; and he fails to explain how the judge erred in rejecting a "gruesomeness" argument.

As to the testimony about Boatman's conviction for the attempted second-degree murder of inmate Apicella at Cross City Correctional, Boatman takes issue with Inspector Hamner's testimony about a sworn interview the since-deceased lead inspector conducted with Apicella. Of relevance, Apicella stated

that the week before the attack, Boatman told Apicella that he stabbed a CO while in Marion County Jail. Here, the statement was introduced by the State—in response to the defense's opening statement suggesting that Boatman acted in self-defense against a threatening Apicella—to show the victim's state of mind, namely that Apicella thought Boatman was violent and thus Apicella would not have been the aggressor. The statement was not offered for its truth (i.e., that Boatman stabbed a CO). Indeed, the stabbing never took place, and the State agreed to a stipulation to be read to the jury that Boatman never stabbed a CO at the Marion County Jail.

In short, we reject Boatman's assertion that "evidentiary rulings prevented him from receiving a fair trial."

**Sufficiency of Evidence / Motion for Judgment of Acquittal**

In two related issues, Boatman argues the evidence was insufficient to support his conviction, and that the court erred in denying his motion for judgment of acquittal. We disagree.

To prove first-degree premeditated murder, the State was required to establish three elements: (1) the victim is dead; (2) the death was caused by the criminal act of the defendant; and (3) the victim's death was premeditated. *Allen,* 322 So. 3d at 603 (citing

- 43 -

*Glover v. State*, 226 So. 3d 795, 804 (Fla. 2017)). In our review of whether competent, substantial evidence supports Boatman's conviction, we "view[] the evidence in the light most favorable to the State" and ask whether "a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Id.* (quoting *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)).

Here, the testimony of numerous witnesses (including the medical examiner), the videos, and Boatman's own words sufficiently established that Chapman is dead, that his death was caused by the criminal act of Boatman, and that his death was premeditated.

We have defined "premeditation" as "a fully formed conscious purpose to kill." *Sexton v. State*, 221 So. 3d 547, 558 (Fla. 2017) (quoting *Asay v. State*, 580 So. 2d 610, 612 (Fla. 1991)). Here, the murder videos show that, among other things, Boatman procured two shanks in advance of the murder, blocked the dayroom door, and, with Wells, viciously attacked Chapman for more than ten minutes before Boatman stomped on a shank in the back of Chapman's neck. Boatman stated during his interview that he and Wells decided days earlier to kill Chapman at the earliest

opportunity. And two COs testified that, during the attack, Boatman said something along the lines of "[T]his guy's going to die today." This evidence was certainly sufficient to establish premeditation.

Because competent, substantial evidence supports the conviction, the evidence was necessarily sufficient to survive Boatman's motion for judgment of acquittal. *See, e.g., Sievers v. State*, 355 So. 3d 871, 883 (Fla. 2022) ("We review the denial of a motion for judgment of acquittal de novo and uphold convictions supported by competent, substantial evidence." (citing *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002))). We deny these claims.

## Standard Criminal Jury Instruction 7.7(b)

Boatman argues the court abused its discretion in denying his request for Florida Standard Jury Instruction (Criminal) 7.7(b) ("Unnecessary Killing to Prevent an Unlawful Act"), which is based on section 782.11, Florida Statutes, a manslaughter statute. Instruction 7.7(b) outlines "four elements" of "the crime of Unnecessary Killing to Prevent an Unlawful Act," as follows:

1.    (Victim) attempted to commit [a felony] [an unlawful act].

- 45 -

2.    (Victim's) attempt to commit [a felony] [an unlawful act] was independent of a[n] [[threatened] unlawful act] directed solely toward (defendant).
3.    (Defendant) resisted (victim's) [failed] attempt to commit [a felony] [an unlawful act] by intentionally committing an act or acts that caused the death of (victim).
4.    (Defendant's) killing of (victim) was unnecessary.

Fla. Std. Jury Instr. (Crim.) 7.7(b).  The exact nature of Boatman's argument on appeal is unclear.

To the extent Boatman argues Instruction 7.7(b) applies because he acted to prevent being sexually battered, he overlooks that, during the charge conference, after the judge stated there was "no evidence, under any strain of persuasion, that would support that Mr. Chapman was committing an unlawful sexual battery," defense counsel conceded the instruction does not apply to self-defense and was "not directed at Mr. Boatman."  Moreover, Boatman overlooks *State v. Carrizales*, 356 So. 2d 274 (Fla. 1978), which held that a jury instruction on section 782.11 is not required "when the accused's defense is self-defense and where the trial judge instructs on the applicable degrees of homicide, excusable homicide, justifiable homicide, and self-defense."  *Id.* at 274-75. Those are the circumstances here.

To the extent Boatman instead argues Instruction 7.7(b) applies because he prevented consensual sexual acts between other inmates, he fails to explain how a consensual sexual act that violates DOC policies is "an unlawful act" as contemplated by Instruction 7.7(b). Even assuming a violation of prison rules—as opposed to a criminal act—qualifies as "an unlawful act," Boatman fails to point to any evidence of "an unlawful act" *not* directed at him. We deny this claim.

## Waiver of Penalty-Phase Jury

Boatman argues the court erred in accepting—over the objection of defense counsel—his pro se waiver of the penalty-phase jury. Boatman asserts he "was not competent to knowingly and intelligently . . . waive said right." We disagree.

"A waiver of the right to a [penalty-phase] jury trial must be knowing, intelligent, and voluntary." *Knight v. State*, 211 So. 3d 1, 17 (Fla. 2016). "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances." *United States v. Ruiz*, 536 U.S. 622, 629 (2002) (emphasis omitted); *see Figueroa-Sanabria*, 366 So. 3d at 1054

(citing *Ruiz* in a case involving defendant's "waiver of his right to the assistance of counsel during the penalty phase").

The knowing, intelligent, and voluntary nature of a waiver of a penalty-phase jury is something "the record must affirmatively show." *Lamadline v. State*, 303 So. 2d 17, 20 (Fla. 1974). Here, the record—including Boatman's lengthy colloquies and his written waiver—firmly supports the trial court's decision. *See, e.g., Lynch v. State*, 254 So. 3d 312, 319-20 (Fla. 2018) (concluding that, based on the "extensive colloquy with [defendant] with regard to his understanding of the rights he sought to waive," and "both the oral and written waiver," which evidenced that defendant "was fully advised of his right to a penalty phase jury," defendant "knowingly and voluntarily waived that right").

At the end of the second day of the penalty phase, defense counsel informed the judge that Boatman was "expressing desires to potentially dismiss the jury." After some discussion, Boatman agreed to the judge's suggestion to think about it for one more night and to discuss the matter with counsel. The next morning, the judge conducted a lengthy colloquy with Boatman and came away with no "reasonable belief" that he was incompetent or that the

- 48 -

desired waiver was "not a knowing, intelligent, and voluntary decision."  But the judge delayed ruling and requested that Dr. Werner, who was scheduled to testify in the afternoon, speak to Boatman, to which Boatman agreed.

After Dr. Werner testified, the judge conducted another lengthy colloquy with Boatman, who reaffirmed his desire to waive the jury.  Among other things, Boatman stated that: he considered the decision for three years; his attorneys had persuaded him to stay with the jury, but he regretted that decision; he had "[s]everal reasons" for waiving the jury, including not wanting the jurors to "have to . . . make a decision that could weigh on their conscience"; he understood all jurors would have to recommend death before death could be considered; he was not under the influence of anything; he considered the advice of counsel; the court would continue to listen to the evidence and arguments and then apply the law; he believed the judge would be fair; and his decision was knowing, intelligent, and voluntary.  Boatman also signed a written waiver.  And he stated he was not hoping for or trying to get a death sentence and was not waiving further mitigation.

Boatman then privately talked with Dr. Werner, who returned

to testify in the absence of the jury. She continued to believe Boatman was "motivated to get off of close management." She conceded the decision "would be a rationale [sic] decision for some individuals." And she was hardly certain when asked if Boatman's decision was free, knowing, and voluntary, saying: "I think that's a question . . . . I don't believe so." She also made clear Boatman did not tell her he viewed the waiver as "his best chance of getting to death row." On cross examination, she conceded Boatman understood the consequences and was making a rational choice in his mind. Boatman also explained to her "why he waited to this point" to waive the jury, including that "he wanted to allow his sister to have the opportunity to testify in front of the jury because he felt that that would alleviate some of her guilt or feelings of guilt." In response to questions from the judge, Dr. Werner answered in the negative when asked whether Boatman was "incompetent to make this decision." And she was again uncertain in her opinion that Boatman's decision was not free, saying: "I'm not sure."

After Boatman informed the court that his decision had not changed, and after final argument, the judge granted the waiver,

- 50 -

concluding it was "overwhelmingly clear" Boatman's decision was valid. We agree. The record conclusively shows Boatman's waiver was knowing, intelligent, and voluntary. The colloquies reflect an intelligent man who considered the decision for years, provided reasons for his waiver, and repeatedly affirmed he understood the nature of the right he was waiving and the consequences of doing so. To the extent Boatman frames this issue as one of "competence," his argument is without merit. Dr. Werner conceded Boatman was competent, and the judge emphasized Boatman had not "suddenly . . . lost [his] competence." We deny this claim.

### Florida's Death Penalty Scheme

Boatman argues Florida's death penalty scheme "does not narrow the death-eligible class in a way consistent with the Eighth Amendment." Citing *Lowenfield v. Phelps*, 484 U.S. 231 (1988), *Furman v. Georgia*, 408 U.S. 238 (1972), and certain law review articles, Boatman asserts that the "large class of death eligible murder offenses" under Florida's scheme is problematic. Last year, we explained that this Court has "repeatedly rejected" the argument regarding "the sheer number of aggravating factors in the statute," including "recently—even with the statute in its current form."

*Wells v. State*, 364 So. 3d 1005, 1015 (Fla. 2023) (citing cases).

Boatman "makes no novel or compelling argument that would warrant reconsideration of the numerous recent decisions of this Court." *Bevel v. State*, 376 So. 3d 587, 597-98 (Fla. 2023). We deny this claim.

### CCP; HAC; Mental Illness; Proportionality

In this final claim, Boatman appears to present four sub-issues, namely that: (1) the court erred in finding CCP; (2) the court erred in finding HAC; (3) Boatman's "serious mental illness" exempts him from the death penalty in the same way *Roper v. Simmons*, 543 U.S. 551 (2005), and *Atkins v. Virginia*, 536 U.S. 304 (2002), exempt juveniles and those with intellectual disability, respectively; and (4) Boatman's death sentence is disproportionate.

Sub-issues (3) and (4) are plainly foreclosed by our case law. Indeed, this Court "lacks the authority to extend *Atkins* to individuals who . . . are not intellectually disabled as provided in *Atkins*," *Barwick v. State*, 361 So. 3d 785, 795 (Fla.), *cert. denied*, 143 S. Ct. 2452 (2023), and is "forbid[den] . . . from analyzing death sentences for comparative proportionality in the absence of a statute establishing that review," *Lawrence v. State*, 308 So. 3d 544,

545 (Fla. 2020). As to sub-issues (1) and (2), competent, substantial evidence supports the findings of CCP and HAC, respectively.

> The CCP aggravator requires proof that
>
> > the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.

*Joseph*, 336 So. 3d at 239 (quoting *Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007)). Boatman appears to take issue with the "cold" and "no pretense of moral or legal justification" elements. But he invites this Court either to reweigh evidence or to "judge this aggravator by the prison code."

Our role is not to reweigh the evidence. Rather, "[t]he trial court's finding of [CCP] is reviewed for competent, substantial evidence." *Santiago-Gonzalez v. State*, 301 So. 3d 157, 178 (Fla. 2020). Here, the sentencing order lays out how CCP was established by the evidence. As the trial court explained, "[t]he manner and circumstances of the crime demonstrate careful planning to ensure the desired result (the death of the victim) which

- 53 -

is supported by [Boatman's] own admissions." That planning included selecting the victim days in advance, coordinating with Wells to obtain shanks and ligatures, and blocking the dayroom door. The evidence "show[s] such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." *Ballard v. State*, 66 So. 3d 912, 919 (Fla. 2011) (citing *Swafford v. State*, 533 So. 2d 270 (Fla. 1988)).

We reject Boatman's assertion that "any planning would have been secondary to his fight or flight response" from "being passed over" on CM review fifteen days earlier. The evidence does not reflect "an act prompted by emotional frenzy, panic, or a fit of rage." *Joseph*, 336 So. 3d at 239 (quoting *Franklin*, 965 So. 2d at 98).

We also reject Boatman's "prison code" proposal, which lacks any authority. In any event, the sentencing order explains there was "no credible evidence of a moral or legal justification for the murder," including "no credible evidence" either that Chapman "had any intent to attack [Boatman]" or that Boatman "was under any actual threat prior to, or at the time of, the murder."

As to HAC, this Court has said the aggravator

applies to murders that are both "conscienceless or pitiless and unnecessarily torturous to the victim." *Francis v. State*, 808 So. 2d 110, 134 (Fla. 2001). . . . To support HAC, "the evidence must show that the victim was conscious and aware of impending death." *King v. State*, 130 So. 3d 676, 684 (Fla. 2013) (quoting *Douglas v. State*, 878 So. 2d 1246, 1261 (Fla. 2004)).

*Joseph*, 336 So. 3d at 236-37. This Court has also said that "death by strangulation constitutes prima facie evidence of HAC." *Barnhill v. State*, 834 So. 2d 836, 850 (Fla. 2002). And "[t]his Court has consistently concluded that a finding of HAC was appropriate in cases where the victim was repeatedly stabbed." *Santiago-Gonzalez*, 301 So. 3d at 179 (citing cases).

Here, as noted in the sentencing order and as established by the medical examiner, "the primary mechanism of death was *multiple stabbings* by metal shanks, blunt force trauma, *and strangulation* by use of a ligature." (Emphasis added.) The evidence shows a torturous attack lasting "over 10 minutes" and "intended not only to kill the victim but to make him suffer physically and mentally." Chapman clearly "was conscious and aware of impending death." *Colley v. State*, 310 So. 3d 2, 15 (Fla. 2020). In short, "[c]ompetent, substantial evidence supports the trial court's finding of HAC." *Santiago-Gonzalez*, 301 So. 3d at 179. The cases

cited by Boatman are either distinguishable or support the HAC finding. *See, e.g.*, *Douglas v. State*, 878 So. 2d 1246, 1262 (Fla. 2004) (upholding HAC and analogizing to cases in which HAC was "based on evidence that the victims were brutally beaten and remained conscious for at least part of the attack").

## III. CONCLUSION

For the reasons stated above, we affirm Boatman's conviction and death sentence.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

In *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), this Court abandoned its decades-long practice of comparative proportionality review in the direct appeals of sentences of death. Because I continue to adhere to my dissent in *Lawrence*, I can only concur in the result.

- 56 -

An Appeal from the Circuit Court in and for Bradford County,
James Matthew Colaw, Judge
Case No. 042019CF000706CFBXMX

David J. Joffe of Joffe Law, P.A., Fort Lauderdale, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Rick A. Buchwalter, Assistant Attorney General, Tampa, Florida,

    for Appellee